UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Stacey C. KOON, Defendant–Appellant, Cross–Appellee.

UNITED STATES of America, Plaintiff–Appellee, Cross–Appellant,

v.

Laurence M. POWELL, Defendant–Appellant, Cross–Appellee.

Nos. 93–50561, 93–50608, 93–50562 and 93–50609.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 2, 1994.

Decided Aug. 19, 1994.

**1424**

Joel Levine, Encino, CA, William J. Kopeny, Santa Ana, CA, for defendants-appellants-cross-appellees.

Steven D. Clymer, Asst. U.S. Atty., Los Angeles, CA, Irv Gornstein, Civil Rights Div., U.S. Dept. of Justice, Washington, DC, for plaintiff-appellee-cross-appellant.

Before: BROWNING and FLETCHER, Circuit Judges, and FITZGERALD,* District Judge.

* Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation.

**FLETCHER, Circuit Judge:**

Stacey Koon and Laurence Powell ("appellants") appeal their jury convictions for deprivation of rights under color of state law in violation of 18 U.S.C. § 242. The United States appeals Koon's and Powell's sentences under the Sentencing Guidelines. We affirm the convictions but remand for resentencing.

## BACKGROUND

The arrest of Rodney King occurred in the early morning of March 3, 1991 in Los Angeles. After drinking malt liquor with two friends, King left a suburb of Los Angeles and began driving. At this time he was intoxicated. Officers Melanie Singer and Tim Singer, both California Highway Patrol ("CHP") officers, observed King's vehicle speeding on the 210 Freeway. The officers began to pursue the vehicle and called on the radio for help. Several Los Angeles Police Department ("LAPD") units joined in the pursuit. Among these units was one manned by Powell and his trainee, codefendant Timothy Wind. The pursuit ended when King pulled his car over at an entrance to the Hansen Dam Recreation Area on Osborne St.

The officers ordered King and the other occupants of the vehicle to get out of the vehicle and assume a felony prone position (*i.e.* King was ordered to lie on his stomach with his arms behind his back, legs spread, heels turned toward the ground, and head turned away from the officers). King got out of the car but did not lie down. At this time Sergeant Koon arrived and took command. Police officers Ted Briseno and Roland Solano arrived soon after. The officers again ordered King to lie in a felony prone position.

King eventually got down on his hands and knees, but did not get into the felony prone position. Officers Powell, Wind, Briseno, and Solano attempted to place him in that position using a "team takedown" or "swarm." King became combative and the

officers retreated. Koon then fired taser darts into King.

The events that occurred next were captured on videotape by George Holliday (the "Holliday videotape"). This videotape was the focus of much of the testimony at trial and is described in detail in the district court's sentencing opinion. *See United States v. Koon,* 833 F.Supp. 769, 774–80 (C.D.Cal.1993). The following description of the events tracks the relevant time frames on the Holliday videotape.

As the videotape begins, it shows that King got to his feet in an attempt to escape. Powell and Wind began to strike King with their batons. At trial it was disputed whether Powell's first blow hit King in the head. The district court concluded that Powell struck King's head accidentally. *Id.* at 777. King fell to the ground and attempted to rise. At 18 seconds, Briseno put his hand on Powell's baton, which Powell had raised as he stood above King.

From 18 to 30 seconds, King attempted to get up, and was struck with batons by Powell and Wind. From the 35th second to the 51st second, Powell struck King repeatedly. At approximately 43 seconds, one or more of Powell's baton blows fractured King's right leg. At 55 seconds, Powell struck King on the chest or upper abdomen. After this blow, King rolled onto his stomach and lay prone. At this point the officers suspended the use of force and stepped back for about ten seconds. Powell began to reach for his handcuffs. The district court found this movement to be evidence that Powell perceived King no longer to be a threat. *Id.*

At 1:05, Briseno moved forward and used his left foot to stomp King in the upper back or neck. King's body writhed in response. At 1:07 on the videotape, Powell and Wind began to strike King again with their batons. At approximately 1:29, King put his hands behind his neck and subsequently was handcuffed.

After King was handcuffed, Powell radioed for an ambulance. Powell sent two messages over the Mobile Digital Terminal to other officers that said "ooops" and "I havent [sic] beaten anyone this bad in a long time."

Koon sent a message to the police station that said "U[nit] just had a big time use of force.... Tased and beat the suspect of CHP pursuit big time."

King was taken to Pacifica Hospital, where he was treated for a fractured right leg, multiple facial fractures, and multiple bruises and contusions. At the hospital, Powell learned that King worked at Dodger stadium, and said to him, "We played a little ball tonight, didn't we Rodney?" King said, "I don't know." Powell said, "You know, we played a little ball, we played a little hardball tonight, we hit quite a few home runs." King responded, "Yeah I guess so." Powell said, "Yes, we played a little ball and you lost and we won."

Koon, Powell, Wind, and Briseno were tried in state court in Simi Valley, California on charges of assault with a deadly weapon and excessive use of force by a police officer. At the trial, Koon, Wind, and Powell's defense was that the force used during the arrest of King was justified and was not excessive. In contrast, Briseno testified that excessive force was used but that he had tried to prevent its use. The four officers were acquitted on all charges except for one count against Powell on which the jury hung.

On August 4, 1992, a federal grand jury indicted the four officers. Count 1 of the federal indictment charged Powell, Wind and Briseno with willfully depriving King of his constitutional rights in violation of 18 U.S.C. § 242 and with aiding and abetting each other in violation of 18 U.S.C. § 2. Count 2 charged Koon with willfully permitting the other officers to unlawfully strike King and willfully failing to prevent the assault of King by officers in his presence, in violation of 18 U.S.C. § 242.

The case was tried to a jury commencing February 25, 1993. The jury verdicts were handed down on April 17, 1993. Officers Briseno and Wind were acquitted; Officer Powell and Sergeant Koon were found guilty of violating § 242. Koon and Powell were sentenced on August 4, 1993 to thirty months imprisonment and two years of supervised release. *See Koon,* 833 F.Supp. at 792. Appellants timely appealed their convictions and

the government timely appealed the sentences. We have jurisdiction.

## DISCUSSION

### A. *Admission of Briseno's State Trial Testimony*

Before trial, the government moved to admit a videotape recording of codefendant Briseno's testimony in the state court proceeding. The videotape, which was ultimately played as part of the government's rebuttal case, was the subject of many motions in the district court, and continues to be the subject of various claims on appeal.

Briseno's testimony was highly damaging to Koon and Powell. He testified, among other things, (1) that Powell's first blow hit King in the face—which was inconsistent with Powell's position at trial; (2) that Powell delivered a second series of much more forceful blows to King "from the shoulder up"; (3) that Briseno couldn't see or understand what justified the other officers' behavior; (4) that Briseno grabbed Powell's baton and told him to "get the hell off" King; (5) that Briseno yelled to Koon "what the fuck [is] going on out here," but Koon did not respond; (6) that the officers continued to strike King with the baton when he was neither aggressive nor combative; and (7) that Briseno went to the police station after the incident intending to report the use of force.

At the state trial, Briseno was cross-examined by all three of his codefendants as well as the prosecutor, who spent part of his time trying to establish Briseno's own culpability. On both direct and cross-examination, Briseno stated repeatedly that he thought the other officers had acted wrongly. These statements of opinion were redacted from the videotape played at the federal trial.

On appeal, Koon and Powell contend that admission of the videotape violated their Confrontation Clause rights. They also argue that the videotape should not have been admitted as rebuttal evidence, and that it contained improper lay opinion evidence.

### 1. *Confrontation Clause Challenge*

"The Confrontation Clause promotes accuracy in the criminal process by ensuring that the trier of fact has a satisfactory basis for evaluating the truth of out-of-court statements." *Barker v. Morris,* 761 F.2d 1396, 1399 (9th Cir.1985) (citations omitted). When a hearsay declarant is unavailable to testify at trial, his out-of-court statements may be admitted without violating the Confrontation Clause so long as those statements bear sufficient indicia of reliability. *Bourjaily v. United States,* 483 U.S. 171, 182–83, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987). "[N]o independent inquiry into reliability is required" under the Confrontation Clause, however, when the out-of-court statements "fall within a firmly rooted hearsay exception." *Id.* at 183, 107 S.Ct. at 2782. Since Rule 804(b)(1) is a firmly rooted exception to the hearsay rule, *Mattox v. United States,* 156 U.S. 237, 15 S.Ct. 337, 39 L.Ed. 409 (1895) (discussing history of the exception); *United States v. Kelly,* 892 F.2d 255, 262 (3d Cir.1989) (collecting authorities), *cert. denied,* 497 U.S. 1006, 110 S.Ct. 3243, 111 L.Ed.2d 754 (1990), our analysis focuses on whether the district court erred under Rule 804(b)(1) in admitting Briseno's former testimony.[1]

Under Rule 804(b)(1), testimony from another proceeding is not excluded by the hearsay rule if the declarant is unavailable,[2] and if "the party against whom the testimony is now offered ... had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."

Appellants argue that the Briseno videotape should not have been admitted because at the state trial they lacked sufficient oppor-

---

1. The parties debate whether, given this collapse of the constitutional analysis into the Rule 804(b)(1) analysis, the abuse of discretion standard which governs admission of Rule 804(b)(1) evidence should apply, *see United States v. Lester,* 749 F.2d 1288, 1301 (9th Cir.1984), or whether the court should review de novo those Rule 804(b)(1) cases in which a constitutional claim is raised. We need not decide the issue, however,

because we conclude that appellants cannot prevail under either standard. *See United States v. Payne,* 944 F.2d 1458, 1468 n. 9 (9th Cir.1991).

2. Appellants do not dispute that Briseno, who chose not to testify in the federal trial, was "unavailable."

tunity to cross-examine Briseno. Appellants point out that in the state proceeding they did not have the benefit of various enhancements to the Holliday videotape which·were available at the federal trial.[3]

■ We reject appellants' argument. Appellants had a full and fair opportunity to cross-examine Briseno in the state trial. Indeed, they do not argue that the state court in any way interfered with their ability to carry out an effective cross-examination. They instead claim that the absence of the enhancements to the videotape at the state trial amounts to a lack of opportunity. We disagree. The failure of a defendant to discover potentially useful evidence at the time of the former proceeding does not constitute a lack of opportunity to cross-examine. *See Thomas v. Cardwell,* 626 F.2d 1375, 1386 n. 34 (9th Cir.1980), *cert. denied,* 449 U.S. 1089, 101 S.Ct. 881, 66 L.Ed.2d 816 (1981). In *Thomas,* the prosecution introduced, at defendant's second trial, the testimony of a witness from defendant's first trial who had become unavailable. *Id.* at 1384. By the time of the second trial, the defendant claimed to have discovered evidence that this witness was schizophrenic. *Id.* at 1386 n. 34. The *Thomas* court rejected the argument that the purported discovery of new evidence established defendant's lack of opportunity to cross-examine the witness at the first trial. After noting that there was no suggestion that the defendant's failure to discover the information was the prosecution's fault, the court explained that

often information will surface after a trial which, if known to a defense attorney, would have made the cross-examination of a witness more thorough or even more advantageous to the defendant. Nevertheless, that lack of information does not make the opportunity for cross-examination ineffective even though the cross-examination itself is less than optimal for the defendant.

*Id.*

■ Much the same applies here. Appellants did not lack the opportunity to cross-examine Briseno; they lacked only some of the tools which were later developed by the government or by appellants themselves, and which appellants argue would have allowed them to cross-examine Briseno to better effect. Appellants' failure to take full advantage of their opportunity to cross-examine in the first trial—by developing those tools earlier—cannot alter the fact that they *had* that opportunity. *See United States v. McClellan,* 868 F.2d 210, 215 (7th Cir.1989) ("the emphasis in [the Rule 804(b)(1) ] inquiry is upon the motive underlying the cross-examination rather than the actual exchange that took place"); *United States v. Salim,* 855 F.2d 944, 953–54 (2d Cir.1988) (under Rule 804(b)(1), defendant is entitled to " 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' ") (quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam)) (emphasis in original).[4]

---

**3.** Three enhancements were used at the federal trial: (1) the "filtered audiotape," which filtered out helicopter noise and purportedly made audible certain commands by Koon as well as the sounds of a taser being activated just before King went down (prepared by the defense); and (2) the "zoom videotape," which blew up the frames showing Powell's first blow to King (prepared by the defense); and (3) the "registered videotape," which stabilized the video image (prepared by the government).

In the district court, in addition to arguing that the lack of these enhancements hampered their ability to cross-examine Briseno during the state proceeding, appellants argued that their motive for cross-examination was different in the state than in the federal trial because in the federal trial the prosecution was required to show a higher level of intent.

Appellants have not pursued this latter argument on appeal.

**4.** Appellants argue that the newly discovered information in *Thomas* pertained only to the credibility of the witness, whereas the newly developed enhancements here pertain to the crime itself. Appellants do not explain why this distinction matters, however, and nothing in *Thomas* reveals its significance either. At the state trial, appellants had the opportunity to cross-examine Briseno concerning both extrinsic facts about the charged crime, and circumstances in his own situation which might lessen his credibility. It is that opportunity, rather than the scope or efficacy of its employment, which is important under Rule 804(b)(1).

In addition to a full opportunity, Rule 804(b)(1) requires that appellants' motive in carrying out their state trial cross-examination of Briseno was similar to the motive they would have had in the later proceeding. We conclude easily that it was. The operative facts and legal issues in the state and federal trials were substantially similar, *see United States v. Salerno,* —— U.S. ——, ——, 112 S.Ct. 2503, 2509, 120 L.Ed.2d 255 (1992) (Blackmun, J., concurring) (" 'similar motive' does not mean 'identical motive' "), and appellants do not challenge the district court's finding to this effect. Appellants thus had every reason to develop Briseno's testimony in the state trial with an eye to undermining his credibility and casting into doubt his statements about their behavior. *See United States v. Poland,* 659 F.2d 884, 895–96 (9th Cir.1981) (holding that defendant's motive for cross-examination at suppression hearing was similar under Rule 804(b)(1) to his motive for cross-examination at trial).

Appellants maintain that their position is supported by *People of the Territory of Guam v. Hayes,* 1993 WL 469357 (D. Guam 1993), in which a three-judge panel held that the trial court erred in admitting former testimony because the defendant had not had the same *motive* to cross-examine the witness about certain facts in the first trial as he had in the second trial. However, the *Hayes* court made clear that this difference in motive occurred because "different issues arose at the second trial which [defendant] could not possibly have anticipated at the first trial." *Id.* at *2.[5]

■ Here, by contrast, there is no suggestion that either the factual nature of the case against appellants or appellants' motive for cross-examining Briseno changed at all from the first to the second trial. All that

changed was the technology that appellants might have used to enhanced the Holliday videotape as a basis for questions in the cross-examination. Because this change constitutes a deficiency in neither the opportunity to cross-examine nor the motive for doing so, appellants' argument under Rule 804(b)(1) must fail.

### 2. Use of Videotape as Rebuttal Evidence

■ Appellants next contend that even if there was no Confrontation Clause violation, the district court erred in admitting the Briseno videotape as rebuttal evidence. As district courts have wide latitude in deciding what constitutes proper rebuttal evidence, *Geders v. United States,* 425 U.S. 80, 86, 96 S.Ct. 1330, 1334, 47 L.Ed.2d 592 (1976), we review such determinations for an abuse of discretion. *Rent–A–Center v. Canyon Television & Appliance,* 944 F.2d 597, 601 (9th Cir.1991).

Appellants first argue that Briseno's testimony did not rebut anything presented in their defenses. We disagree. Briseno's testimony rebutted Koon's statement that Powell's first blow struck King on the shoulder area rather than on the head, Koon's expert's testimony that the officers' use of force was justified because King continued to be combative and aggressive, and Powell's former police instructor's testimony that Powell had done nothing he had not been trained to do.

Appellants next argue that even if some portions of the videotape properly rebutted elements of their cases, the district court nonetheless erred in permitting the government to introduce as rebuttal *both* those parts of the videotape which in fact rebutted their evidence, *and* those parts which were offered solely against Briseno.[6] No one sug-

---

5. The victim in *Hayes,* "K.," testified at defendant's first trial, but then moved from Guam and was unavailable at the second trial. K's testimony from the first trial was introduced at the second trial. The prosecution also called as a witness Mrs. Muna, who testified about statements made by K. which were *not* disclosed at the first trial. The appellate court concluded that defendant's motive to cross-examine K. was different at the first than at the second trial, because at the first trial defendant did not have "the additional motivation ... of proving that K.

didn't make the statements attributed to her by Mrs. Muna." *Id.* at *2.

6. Briseno neither testified nor presented any evidence on his behalf, save for introducing a single boot, one he had worn the night of the incident. At trial, he argued that his Fifth Amendment rights would be violated if his former testimony was admitted against him on rebuttal despite the fact that he had put on no evidence of his own. He was concerned primarily with those portions of the videotape in which he testified that he went to the police station to file a report on the

gests that appellants have standing to appeal any violation of Briseno's rights which such procedure might have worked. Appellants instead claim that their own rights were violated because playing the *entire* redacted videotape as rebuttal gave the government's case against them "undeserved weight and dramatic force." Reply Br. of Powell at 23.

■ We reject this claim. District courts have broad discretion in deciding the order in which evidence may be presented at trial. *See* Fed.R.Evid. 611(a) (trial courts "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence"). Indeed, the Advisory Committee Notes to Rule 611(a) reveal that the rule was intended to avoid imposing on the district courts strict rules concerning the order in which evidence should be presented. Moreover, several courts have held that district courts have wide discretion to allow the government to introduce as part of its rebuttal case evidence which might have been presented in the government's case-in-chief. *E.g., United States v. Tejada,* 956 F.2d 1256, 1267 (2d Cir.1992), *cert. denied,* — U.S. ——, 113 S.Ct. 124, 121 L.Ed.2d 80 (1992); *United States v. Braxton,* 877 F.2d 556, 561 (7th Cir.1989).

■ Here, where it was unclear whether Briseno would testify at trial, and where playing the videotape during the government's case-in-chief could have been unnecessarily duplicative, the district court did not abuse its discretion in allowing the government to postpone playing the videotape until its rebuttal case. *See Tejada,* 956 F.2d at 1267 ("Any other rule would require attorneys to present evidence in advance to rebut every possible scenario that defendants might paint"). Moreover, appellants were allowed to put on surrebuttal. *See United*

States v. Goodwin, 770 F.2d 631, 638 (7th Cir.1985) (defendant's ability to present a surrebuttal case helped defuse any prejudice which might have flowed from government's rebuttal).

■ Appellants have not shown how playing as rebuttal those portions of the videotape pertaining solely to Briseno unfairly prejudiced them. These portions represent only a small part of the entire tape. They reflect on Briseno's credibility as a witness and thus may have helped appellants by undermining the government's reliance on his incriminating statements about appellants. In any case, having the Briseno-related portions played along with the portions rebutting appellants' cases was simply a consequence of the joint trial. In *United States v. Papia,* 560 F.2d 827, 848–49 (7th Cir.1977), the Seventh Circuit held that evidence rebutting one defendant's case could also be introduced, on rebuttal, against a second defendant even if that defendant had, like Briseno, presented no evidence. All codefendants suffer what appellants claim to have suffered here: the accumulation of evidence of guilt which comes from being tried with other defendants. In an extreme case, this cumulative effect may indeed become so unfairly prejudicial that severance is warranted. But clearly this is not such a case. *Cf. United States v. Baker,* 10 F.3d 1374, 1386–89 (9th Cir.1993) (district court did not abuse its discretion in failing to sever trial lasting over 16 months and involving 15 defendants, 250 witnesses, and 30,000 pages of transcripts).[7]

### 3. *Lay Opinion Testimony*

Many statements in which Briseno expressed his opinion about his codefendants' wrongdoing were excised from the videotape before it was shown to the jury. Appellants

---

use of force. The government's position was that Briseno never went to the police station, and that his false exculpatory statement was proof of his consciousness of guilt.

**7.** Appellants also contend that the admission of the video as rebuttal was inappropriate under *United States v. Neary,* 733 F.2d 210 (2d Cir. 1984), because they each had a Rule 29 motion pending. *Neary,* however, held that where the district court has erred in failing to grant defendant's Rule 29 motion at the close of the govern-

ment's case-in-chief, the government cannot cure the deficiencies in its proof by pointing to evidence it presented on rebuttal, because doing so would "make a mockery" of the defendant's right under Rule 29 to acquittal where the government has not satisfied its burden of proof in its case-in-chief. *Id.* at 219–20. *Neary* would thus apply only if the government's proof fell short at the close of its case-in-chief. That is not the case here. *See* Section I, *infra.*

contend, however, that various statements of opinion remained.

Many of the statements about which appellants complain are simply not opinions. Appellants argue that even Briseno's descriptions of the other officers' actions should not have been admitted. Appellants seem to suggest that these descriptions were akin to opinions insofar as they revealed that Briseno was testifying against his codefendants rather than on their behalf. Whomever they may have hurt or benefitted, however, the straightforward physical descriptions in question do not constitute opinions.

■ Appellants also contend that Briseno's statement that he went to the Foothills police station intending to report a use of force should not have been admitted, because he would not have taken this action unless he believed that the use of force had been wrong. We decline to adopt a rule barring testimony about actions which are motivated by opinions. Actions are usually motivated by opinions or beliefs, but testimony about the actions is clearly not for that reason inadmissible. Koon's testimony, for example, was filled with descriptions of actions he took because he had formed certain opinions about King's behavior.

Appellants argue that they were prejudiced when the jury learned of Briseno's statement that Powell was "out of control." This phrase was removed from the redacted version of Briseno's testimony presented to the jury. When Koon was recalled as a surrebuttal witness, however, the prosecutor on cross-examination twice referred to the fact that Briseno had said that Powell was out of control. Appellants contend that this interjection of Briseno's opinion was improper.[8]

■ The Federal Rules of Evidence allow lay opinion testimony so long as the opinion is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed. R.Evid. 701; *United States v. Juvenile Male,* 864 F.2d 641, 647 (9th Cir.1988) (admitting, under Rule 701, witness's opinion as to defendant's intent); *accord United States v. Simas,* 937 F.2d 459, 464 (9th Cir.1991). Both requirements were met here. First, Briseno's opinions were rationally based on his first-hand observations. Second, the opinion that Powell was out of control was helpful in determining factual issues central to the case. Appellants are wrong that Briseno's statements are no more than conclusory assertions about ultimate issues. The ultimate issue in the case was not whether the defendants were out of control, but whether they willfully used unreasonable force. The fact that Powell may have been out of control could have helped the jury resolve that issue; at the same time, it certainly did not settle the issue in and of itself.[9] Briseno's statement thus was not "testimony which merely tells [the jury] what result to reach." 3 *Weinstein's Evidence* ¶ 701[02], at 701-25.[10]

---

8. Appellants' argument is based on the contention that Briseno's statements constituted lay opinion testimony. While we reject this argument, *see infra,* we note that by questioning Koon about a redacted portion of the Briseno videotape, the government improperly referred to a matter not in evidence. We conclude, however, that the error (to which no objection was made) did not affect substantial rights. The transcript of the videotape which *was* admitted into evidence contained opinion statements much more directly damaging to appellants than the "out of control" statements—such as Briseno's statement that the force used by Powell and Wind was unjustified. And as discussed below, *see infra* Section I, there was ample evidence quite apart from the Briseno videotape on which the convictions could be sustained. The "out of control" statements were a tiny portion of a case which the government tried in extraordinary detail. *See Koon,* 833 F.Supp. at 774.

9. Moreover, the court admitted characterizations of Powell's actions which were *helpful* to the defense—most notably, Briseno's statement that the first baton blow to King's head was accidental. The statement that an officer swinging a baton is out of control, like the statement that an officer has hit a suspect with a baton by accident, is both an opinion and an observation.

10. Appellants also argue that Briseno's opinions impermissibly entered the case when the prosecutor, in closing, stated that Briseno had "testif[ied] that other people committed crimes," and that "[t]he videotape of [Briseno's] testimony shows that the beating of Rodney King was unreasonable." RT 4/10/93 (AM) at 103. But these statements are better read as permissible inferences drawn from the factual testimony which the jury heard than as surreptitious references to the opinion testimony which was excised.

In sum, we conclude that no error was committed in the admission of the Briseno videotape.

## B. *Fifth Amendment Protection Against Use of Compelled Statements*

After they were warned that they could lose their jobs if they refused to make statements, Koon and Powell gave compelled statements to the LAPD Internal Affairs Division. Appellants contend that the introduction of codefendant Briseno's state trial testimony and the testimony of prosecution witness Mark Conta violated their Fifth Amendment rights because Briseno and Conta were exposed to appellants' compelled statements prior to testifying.

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Constitution thus requires that "the government seeking to punish an individual produce the evidence against him by its own independent labors, rather than by the cruel, simple expedient of compelling it from his own mouth." *Miranda v. Arizona,* 384 U.S. 436, 460, 86 S.Ct. 1602, 1620, 16 L.Ed.2d 694 (1966).

In accordance with this fundamental principle, the Supreme Court has recognized that the Fifth Amendment protection against coerced statements extends to public employees who must choose either to incriminate themselves or to forfeit their jobs during an administrative hearing. *Garrity v. New Jersey,* 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967). Thus, where police officers such as Koon and Powell invoke their Fifth Amendment rights and subsequently make a statement under threat of removal from office, the statement is compelled and the government is precluded from using either the statement or information derived from it as evidence in the federal trial. *Id.*

at 497, 87 S.Ct. at 618; *see also Kastigar v. United States,* 406 U.S. 441, 460–61, 92 S.Ct. 1653, 1664–65, 32 L.Ed.2d 212 (1972).

Once a defendant has demonstrated that his statements were compelled, the government has the burden of proving in a "*Kastigar* hearing" by a preponderance of the evidence that the evidence it intends to introduce in a subsequent criminal proceeding is not tainted by exposure to the compelled statements. *Kastigar,* 406 U.S. at 461–62, 92 S.Ct. at 1665–66; *United States v. Rogers,* 722 F.2d 557, 560 (9th Cir.1983), *cert. denied,* 469 U.S. 835, 105 S.Ct. 129, 83 L.Ed.2d 70 (1984).

In this case, the parties disagree as to the precise type of showing that is required to establish that a witness who has been exposed to compelled testimony is not tainted by that exposure. Our circuit has twice considered this issue in the context of testimony that was compelled pursuant to federal immunity statutes. *See* 18 U.S.C. § 6002. In both cases, we held that the government meets its *Kastigar* burden by showing that each matter as to which the witness will testify is derived from a source independent of the immunized testimony.[11]

In *United States v. Lipkis,* 770 F.2d 1447 (9th Cir.1985), the defendant first made voluntary statements on three occasions to an FBI agent and subsequently made identical statements to the same agent under a grant of immunity. *Id.* at 1449. The FBI agent became the government's witness at trial and Lipkis argued that the agent's testimony should have been excluded because it was tainted by the agent's exposure to the compelled statements. We held that because the defendant's immunized statements were the same in every material respect as the prior, non-immunized statements, the government had met its burden of proving that all the evidence introduced at trial was derived from

---

11. The government expresses some concern about applying cases that analyze federal use immunity statutes in the *Garrity* context. However, in *Kastigar,* the leading Supreme Court case regarding use immunity granted pursuant to 18 U.S.C. § 6002, the Court upheld the constitutionality of the federal immunity statute because it concluded that the statute provided immunity that was coextensive with the Fifth Amendment

protections. 406 U.S. at 463, 92 S.Ct. at 1666. Because the use of compelled testimony in the *Garrity* context also directly implicates the individual's Fifth Amendment right against self-incrimination, *Kastigar's* discussion of the scope of the Fifth Amendment privilege against self-incrimination is directly relevant in the *Garrity* context.

a legitimate source that was wholly independent of the immunized statements. *Id.* at 1449–51.

Similarly, in *Rogers,* a government witness had attended a proceeding in which the defendant testified under a grant of immunity. On appeal, we held that the witness's testimony was permitted because it was clear that it was based on information the witness learned on his own rather than on the immunized testimony. *Rogers,* 722 F.2d at 560.

■ The standard applied in our circuit is taken directly from the language of *Kastigar,* which provides:

> Once a defendant demonstrates that he has testified, under a . . . grant of immunity, to matters related [to the current prosecution], the federal authorities have the burden of showing that their evidence is not tainted by establishing that they had an independent, legitimate source for the disputed evidence.
>
> This burden of proof . . . is not limited to a negation of taint; rather, it imposes on the prosecution the affirmative duty to prove that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony.

406 U.S. at 460, 92 S.Ct. at 1665 (internal citations omitted) (quoting in part *Murphy v. Waterfront Comm'n,* 378 U.S. 52, 79 n. 18, 84 S.Ct. 1594, 1609 n. 18, 12 L.Ed.2d 678 (1964)). Thus, under *Kastigar* and this circuit's precedent, the prosecution meets its Fifth Amendment burden of proving that compelled testimony is not used against a defendant when it produces a legitimate, wholly independent source for all matters as to which the witness will testify.

Appellants contend that we should reject the holding of *Rogers* and *Lipkis* and instead adopt the standard recently articulated by the District of Columbia Circuit in *United States v. North ("North I"),* 910 F.2d 843, modified, *("North II"),* 920 F.2d 940

(D.C.Cir.1990), *cert. denied,* 500 U.S. 941, 111 S.Ct. 2235, 114 L.Ed.2d 477 (1991), and *United States v. Poindexter,* 951 F.2d 369 (D.C.Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992). These cases, in what is "the most expansive reading of the Fifth Amendment to date regarding the evidentiary use of immunized testimony," *United States v. Helmsley,* 941 F.2d 71, 82 (2d Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992), require the prosecution to make a two part showing to meet its *Kastigar* burden. First, as in our circuit, the prosecutor must prove that there is an independent source for all matters on which the witness testifies. *Poindexter,* 951 F.2d at 373. And second, the prosecutor must prove that any witness exposed to compelled statements has not shaped or altered her testimony in any way, either directly or indirectly, as a result of that exposure. *Id.; North II,* 920 F.2d at 942; *North I,* 910 F.2d at 860–63, 872–73.[12]

In asking us to apply *North* and *Poindexter,* appellants fail to acknowledge that those cases are not the law of this circuit. In fact, we have previously rejected contentions similar to appellants' that *Kastigar* requires a greater showing on behalf of the prosecution. In *Lipkis,* the prosecution witness had been exposed to both immunized testimony and to non-immunized testimony. In affirming the district court, we specifically rejected the defendant's contention that *Kastigar* required the prosecution to prove that the witness's testimony was based on only the non-immunized statements and not on the identical immunized statements, recognizing that such a showing was both impossible and unnecessary. *Id.* at 1451.

In sum, it is the law of our circuit that the prosecutor's *Kastigar* burden is met if the substance of the exposed witness's testimony is based on a legitimate source that is independent of the immunized testimony. Ensuring that the content of a witness's testi-

---

12. In *North I,* the D.C. Circuit stated that this burden could be met by establishing that the witness's allegedly tainted testimony contains no evidence not "canned" by the prosecution before such exposure occurred. *North I,* 910 F.2d at 872–73. On rehearing, the court modified the requirement that the exposed witness's testimony be "canned," stating that this was only an example of the ways in which the prosecution's burden might be met. *North II,* 920 F.2d at 942–43 (but noting that "it may well be extremely difficult for the prosecutor to sustain its burden of proof" in the absence of canned testimony).

mony is based on personal knowledge provides the required Fifth Amendment protections and meets the *Kastigar* requirement that the defendant's compelled statements shall not be used against him in subsequent criminal proceedings.[13]

### 1. *Briseno's Testimony*

Prior to admitting the videotape of Briseno's state trial testimony, the district court held a *Kastigar* hearing in which it assumed that Briseno had read Koon's and Powell's compelled statements[14] and considered whether Briseno's state trial testimony was tainted by the exposure. The court concluded that Briseno's testimony was not tainted by the exposure to the compelled statements. We review this factual finding for clear error, *see Rogers*, 722 F.2d at 560, and conclude that it is not clearly erroneous.

■ The record reflects a legitimate, independent source of information with respect to each matter as to which Briseno testified. Briseno was an eyewitness to the events at issue in the trial and thus had independent personal knowledge of the events to which he

testified. In addition, other witnesses at the state trial, including CHP officers Melanie Singer and Timothy Singer and police officer Solano, testified before Briseno and in his presence at length about the events surrounding the arrest of Rodney King. Briseno also saw the Holliday videotape prior to giving his own testimony. Finally, both Koon and Powell testified at the state trial before Briseno testified; Briseno was present in the courtroom on those occasions and heard appellants' testimony. At the *Kastigar* hearing, the government presented an annotated transcript of Briseno's state testimony, indicating the independent sources for all of the same information contained in the compelled statements.

This case is therefore like *Lipkis*, in which a witness was exposed to two substantially identical statements, one of which was immunized and one of which was not. Like the prosecution in *Lipkis*, the prosecution in this case successfully established that Briseno's state trial testimony had a basis in legitimate, independent sources and therefore was

13. The standard articulated by the D.C. Circuit to statements that are compelled in the *Garrity* context has potentially far-reaching ramifications. As the *North* court recognized, federal immunity statutes provide a framework for a prosecuting attorney or Congress to make a reasoned decision as to whether the benefits of obtaining compelled testimony justify the obstacles that may be created in any future prosecutions. The process of formal grants of immunity also provides time for the prosecutor to protect the testimony of potential witnesses by obtaining canned statements and by shielding these witnesses from exposure to the immunized testimony. *North II*, 920 F.2d at 945–46.

In contrast, immunity attaches in the *Garrity* context when a threat of the loss of employment forces a public employee to respond to questioning by another public employee. In this context, the individuals who question the employee are concerned about potential misconduct, and their goal is generally to learn the facts of a situation as quickly as possible. They do not necessarily act with the care and precision of a prosecutor weighing the benefits of compelling testimony against the risks to future prosecutions; indeed, they may not even have the prospect of prosecution and the requirements of the Fifth Amendment in mind. In addition, because statements may be compelled soon after the event in question, it is far more likely that these statements will be circulated before there is an opportunity

to can testimony. Although this may occur out of a legitimate desire to ascertain the truth of the matter, it may also occur out of a desire to protect one's colleagues. Thus, in the context of internal affairs investigations, police officers could protect each other by compelling testimony and disseminating it widely, placing any criminal prosecution at serious risk and possibly barring prosecution altogether.

We do not mean to suggest that the showing required under the Fifth Amendment varies depending on the situation in which the testimony was compelled. The Fifth Amendment protects defendants from the use of their compelled statements regardless of when or where the statements were taken. We merely point out the implications of applying *North* in the *Garrity* context. In light of those implications and because we believe that the standards enunciated by our circuit comply fully with the requirements of the Fifth Amendment, we decline to adopt the D.C. Circuit's more protective standard.

14. The parties stipulated that Briseno received appellants' compelled statements. Pursuant to *Skelly v. State Personnel Bd.*, 15 Cal.3d 194, 124 Cal.Rptr. 14, 539 P.2d 774 (1975), LAPD officers who face disciplinary proceedings are provided with a *"Skelly* package" containing all of the evidence from internal investigations of the matter, including the compelled statements of other LAPD officers.

not tainted by any exposure to Koon's and Powell's compelled statements.

### 2. *Conta's Testimony*

Appellants also object to the testimony of Mark Conta, the government's use-of-force expert. At the time of the federal trial, Conta was the officer in charge of physical training and self-defense at the Los Angeles Police Academy. At trial he testified regarding use-of-force policy and gave his opinion that most of the baton blows inflicted by Powell and Wind during King's arrest were contrary to LAPD policy. Prior to trial, the district court held a *Kastigar* hearing and found that Conta had not been exposed to the compelled statements. We conclude that this finding is not clearly erroneous.

Appellants claim that Conta was indirectly exposed to their compelled statements in two ways. First, they contend that Conta listened to the testimony of Fred Nichols, the use-of-force expert the state intended to use at the state trial, at a *Kastigar* like hearing during the state trial. At that time, Nichols was Conta's supervisor and the officer in charge of physical training and self-defense at the Los Angeles Police Academy. Although the state had planned to use Nichols as its use-of-force expert at the state trial, Nichols was disqualified as a witness after he testified at the state *Kastigar* hearing that he was exposed to the compelled statements and that his testimony would be affected by this exposure. Appellants contend that because Conta was present at this hearing at which Nichols testified regarding his exposure to the compelled statements, Conta also was exposed to the compelled statements.

■ Conta's presence at the state hearing, however, did not expose him to the compelled statements. The transcript of the hearing reflects that Nichols testified only regarding when he was exposed to the compelled statements and whom he spoke to about those statements. Nichols did not quote or read from the compelled statements, nor did he engage in any discussion regarding the substance of the statements.

■ Appellants also contend that Conta was exposed to the compelled statements during approximately twenty informal discussions with Nichols about the King incident. At the *Kastigar* hearing, Conta agreed that he conversed with Nichols about the King incident but stated that at no time did Nichols make any statement that related to or appeared to relate to the content of the compelled statements. Conta further testified:

> You see, when the Rodney King incident occurred two years ago today, and we witnessed the TV portions of the tape and then on March the 8th I watched the tape in its entirety as I indicated, and I knew at that time that Sergeant Nichols was probably going to come forward and represent [sic] the state during the prosecution process, and I also knew that sergeant—excuse me—Detective Arce and Kwock who were at the office at this time had requested that Sergeant Nichols prepare a document.
>
> Sergeant Nichols told me that this document was confidential and that he was going to render an opinion that was going to go to the state grand jury. That was a cue to me, and it was very clear in my mind, that Sergeant Nichols was on a mission, and it was his responsibility, and that he was going to go forward and testify for the prosecution, and he was going to go forward and prepare this document. And he told me that he was going to prepare this document and that it was confidential. Confidential. I wanted to stay away from him. I felt that it was his thing and that I wanted to stay away and I didn't want to get into any deep discussions regarding the Rodney King incident based on that fact and that information.

RT 3/3/93 at 39. In addition, Conta noted that his testimony at trial would be based on his twenty-two years of experience as a police officer, his education as a training officer for nine and a half years, his training at the Los Angeles Police Academy in the use-of-force policy and self defense techniques, his review of the Holliday videotape, the arrest report prepared by Powell, the sergeant's log prepared by Koon, a use-of-force report, a CHP supplemental report, and the state trial testimony of Koon, Powell, and Briseno.

Faced with this evidence, the district court found that Conta was not exposed to appellants' compelled statements. We conclude that this finding is not clearly erroneous.

## C. Severance

■ Appellants challenge the district court's refusal to sever their trial from codefendant Briseno's. We review a district court's denial of a motion to sever a trial for an abuse of discretion. *United States v. Vasquez–Velasco*, 15 F.3d 833, 844 (9th Cir. 1994); *United States v. Cuozzo*, 962 F.2d 945, 949 (9th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 475, 121 L.Ed.2d 381 (1992).

■ Fed.R.Crim.P. 14 governs the severance of defendants or charges.[15] Rule 14 recognizes that even when defendants are properly joined under Fed.R.Crim.P. 8(b), severance may be appropriate to avoid prejudice to a defendant. The party seeking reversal of the denial of a motion to sever bears the burden of proving such "clear, manifest, or undue prejudice from the joint trial, that [it] violates one of his substantive rights, so that the prejudice is of such a magnitude that the defendant was denied a fair trial." *E.g.*, *Vasquez–Velasco*, 15 F.3d at 845–46 (internal quotations omitted).

■ In this case, appellants argue that the district court should have severed the trial on the grounds that they and Briseno presented mutually antagonistic defenses.[16] *See, e.g.*, *United States v. Tootick*, 952 F.2d

1078, 1083–86 (9th Cir.1991); *United States v. Rucker*, 915 F.2d 1511, 1513 (11th Cir. 1990). Appellants' argument is without merit.

The fundamental flaw in appellants' claim is that Briseno did not raise an inconsistent defense in the federal trial; in fact, the only independent defense he raised was to offer into evidence the boot he wore on the night in question. Thus, no antagonistic defenses were raised in the federal trial.

In fact, Appellants' argument rests on the fact that their defense strategy in the *state* trial differed from that of Briseno: while appellants' defense was that no excessive force was used, Briseno's defense was that his fellow officers used excessive force which he tried to prevent. Admission of the videotape of Briseno's state trial testimony did not constitute grounds for severance, however, because the majority of statements on the videotape were admitted into evidence to rebut assertions made by Koon and Powell, *see* Fed.R.Evid. 804(b)(1); *Zafiro v. United States*, — U.S. —, —, 113 S.Ct. 933, 938, 122 L.Ed.2d 317 (1993), and therefore would have been admitted even if Briseno had not been a codefendant in the federal trial. Moreover, the evidence from the videotape which was admitted solely against Briseno was not unduly prejudicial to appellants. That evidence consisted primarily of Briseno's testimony in the state trial that, after the use of force, he was upset about the use of force and returned to the police sta-

---

**15.** Rule 14 provides in relevant part:
> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

**16.** We reject the government's contention that Powell waived his right to appeal this issue because he failed to renew his motion to sever at the close of the government's case. Although a defendant generally waives a severance motion by failing to renew it at the close of evidence, "[t]his requirement is not an inflexible one; waiver may be absent when the motion accompanies the introduction of evidence deemed prejudicial and a renewal at the close of all evidence would constitute an unnecessary formality." *United States v. Felix–Gutierrez*, 940 F.2d 1200, 1208 (9th Cir.1991), *cert. denied*, — U.S. —,

113 S.Ct. 2332, 124 L.Ed.2d 244 (1993) (internal quotations omitted).

"The guiding principle is whether the defendant diligently pursued the motion." *Vasquez–Velasco*, 15 F.3d at 845 & n. 9 (internal quotations omitted). In this case, Powell diligently pursued the motion; he moved to sever the trial prior to trial and renewed his motion immediately prior to the admission of the evidence deemed prejudicial—the recorded trial testimony of Briseno. *Id.* at 845. Moreover, the district court had previously denied the defendants' motions for severance on two occasions, indicating that a renewal of the motion after the government's rebuttal would have been an unnecessary formality. *See Cuozzo*, 962 F.2d at 949 n. 5; *United States v. Kaplan*, 554 F.2d 958, 966 (9th Cir.), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977).

tion to report the incident. Briseno testified that while he was at the station he noticed a message from Koon over the Mobile Digital Terminal which he interpreted as a report of the incident, and he decided that he did not need to file a report because Koon had already reported the incident. This testimony was neither mutually antagonistic to appellants' defense nor was it unduly prejudicial.

Even if we were to assume that the videotape was admitted only because Briseno was a codefendant, Briseno's state trial defense and appellants' federal defense were not irreconcilable. Although we have recognized that "mutually antagonistic" or "irreconcilable" defenses may be so prejudicial as to require severance, severance based on these grounds is appropriate only when "the acceptance of one party's defense will preclude the acquittal of the other party.... [T]he essence or core of the defenses must be in conflict such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *United States v. Sherlock*, 962 F.2d 1349, 1362–63 (9th Cir.) (internal citations and quotations omitted), *cert. denied*, — U.S. —, 113 S.Ct. 419, 121 L.Ed.2d 342 (1992). In this case, the Briseno tape and appellants' defense were not mutually exclusive because a jury could find that Briseno thought the force was excessive while also finding that the force was not in fact excessive. *See, e.g., United States v. Arias–Villanueva*, 998 F.2d 1491, 1506–07 (9th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 359, 126 L.Ed.2d 322 (1993). Alternatively, a jury could believe Briseno's testimony that the use of force was excessive but also acquit all of the officers on the grounds that it was not willful.

Appellants also suggest that their defenses were mutually antagonistic because they have taken adversarial positions to Briseno in Rodney King's subsequent civil suit. Appellants do not explain how such a factor is in any way relevant to the district court's denial of their motion to sever in the criminal case. We therefore conclude that

because no mutually irreconcilable defenses were presented by Briseno and appellants, the district court did not abuse its discretion in refusing to sever the trial.[17]

### D. *District Court's Failure to Disqualify Powell's Counsel*

Koon contends that the district court erred by failing to disqualify Powell's attorney before trial. Most of the relevant facts are not disputed. Shortly after the Rodney King incident, the Los Angeles Police Protective League appointed Michael Stone, its General Counsel, to represent Powell. Darryl Mounger was appointed to represent Koon. Stone also represented Powell in the federal civil case related to this case. Mounger, however, declined to represent Koon in the civil case. In an effort to assist Koon, Stone contacted Thomas Feeley, a civil rights defense lawyer. Feeley agreed to represent Koon in the civil case.

While the state criminal action and the federal civil action were pending, Stone and Feeley joined their practices. They obtained written waivers of conflict from their clients before forming the new firm. After the firm was formed, oral waivers were taken on the record in the state criminal proceeding.

Eleven months after the waiver in state court, and three months before the federal criminal trial was to begin, Koon revoked his waiver and requested that the district court grant whatever relief it deemed appropriate under *Wheat v. United States*, 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Koon explained that intervening events had led him to believe that a conflict existed. The most important of these events stemmed from the formation of the partnership between Feeley and Stone: Koon feared that Stone might gain access to confidential information possessed by Feeley, and might use it to Koon's disadvantage in the criminal trial.

The district court's solution was to disqualify Feeley from representing Koon in the civil trial, but to allow Stone to continue to represent Powell in the criminal trial. We

---

17. Even in cases in which defendants do raise mutually antagonistic defenses, there is no per se rule requiring severance. *See Zafiro*, — U.S. at —, 113 S.Ct. at 938 (stating that "Rule 14 does not require severance even if prejudice is shown; rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion").

review that decision for abuse of discretion. *See United States v. Baker,* 10 F.3d 1374, 1399 (9th Cir.1993).

### 1. *The Stone & Feeley Partnership*

 As the district court explained, the conflict asserted here more closely resembles "successive representation" than "dual representation." The problem Koon complains of is not that his attorney in the criminal case was unable to be completely loyal to him, but rather that confidences which he had divulged to an attorney in another case might be used against him in the criminal case.

The leading case on successive representation in this circuit is *Trone v. Smith,* 621 F.2d 994 (9th Cir.1980), in which we restated the rule that an attorney must be disqualified if he or she formerly represented an adverse party in a matter "substantially related" to the current representation. *Id.* at 998 (citing *Gas-A-Tron of Arizona v. Union Oil Co. of California,* 534 F.2d 1322, 1325 (9th Cir.), *cert. denied,* 429 U.S. 861, 97 S.Ct. 164, 50 L.Ed.2d 139 (1976)). Substantial relationship may be presumed where there is a "reasonable probability that confidences were disclosed which could be used against the client in later, adverse representation." *Id.* at 998. But even if there is no sharing of confidences, "[t]he substantial relationship between the two representations is itself sufficient to disqualify." *Id.* at 999.

 Attorney conflict may require a court to disqualify counsel despite the fact that the rights of a party may be compromised by that disqualification. While a trial judge "must recognize a presumption in favor of [defendant's] counsel of choice . . . that presumption may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." *Wheat,* 486 U.S. at 164, 108 S.Ct. at 1700.

The task for the district court was to balance Powell's qualified Sixth Amendment right to the counsel of his choice against the potential for conflict asserted by Koon. *See United States v. Wheat,* 813 F.2d 1399, 1402 (9th Cir.1987), *aff'd,* 486 U.S. 153, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *United States*

*v. Cunningham,* 672 F.2d 1064, 1070 (2d Cir.1982).

The district court recognized that Powell's interest in retaining Stone was strong. Stone had represented Powell at the state criminal trial, had obtained good results for him there, and was familiar with the case.

The district court found that Koon's interests, by contrast, were weak. The court noted that at the time Feeley and Stone joined their practices, their firm adopted screening procedures designed to ensure that confidential information Koon had imparted to Feeley would not be disclosed to Stone. There was also evidence that Stone had never discussed confidential information about Koon with Feeley, did not have access to Feeley's files, and had never met with Koon outside the presence of one of Koon's criminal attorneys.

This circuit has not yet decided whether such screening procedures, or such evidence, may rebut the presumption that lawyers in the same law firm share information. *See Trone,* 621 F.2d at 999 n. 4; *Paul E. Iacono Structural Eng'r, Inc. v. Humphrey,* 722 F.2d 435, 442 (9th Cir.1983). We need not resolve that issue here. On appeal, we have the advantage of hindsight. Allowing Stone to continue as Powell's attorney worked no disadvantage to Koon: Koon points to nothing in the course of trial which even suggests that Stone behaved adversely to him on the basis of confidential information, or, indeed, that Stone behaved adversely to him *at all.*

 This court has cautioned that where a criminal defendant's right to the counsel of his choice is at loggerheads with the need for conflict-free counsel, "[r]eviewing courts should be especially wary of complaints of error," because trial courts are placed "in a position to be whipsawed in the expectation of a guaranteed error no matter which way the courts rule." *Wheat,* 813 F.2d at 1402. Here, where Koon can point to *no ill consequence* flowing from the district court's elevation of Powell's right to the counsel of his choice over Koon's right to avert a possible breach of confidentiality, we cannot say that the district court abused its discretion when it found that Koon had shown neither an actual conflict nor a serious

potential for conflict. As subsequent events have made clear, the district court accurately assessed the possibilities.[18]

### 2. *Other Allegations of Conflict*

■ Koon also argues that a conflict was evidenced by the following facts: (1) Stone returned to the government a memorandum the government had inadvertently disclosed, and did so without showing the memorandum to Koon; (2) Powell's position on certain evidentiary issues was contrary to Koon's; (3) Powell's sister worked as a secretary in Stone's law office; and (4) Stone had announced during the state court proceedings that an expert might not be able to testify because of an attorney-client relationship with Stone.

The district court found that none of these facts established a conflict: (1) Stone acted properly by returning the government memorandum; (2) Powell's and Koon's positions on evidentiary issues were not necessarily inconsistent; (3) no showing had been made that Powell's sister had access to any material pertaining to Koon; and (4) Koon's fear that potential expert witnesses in *this* case would decline to testify based on previous contacts with Stone was speculative, and his fear that Stone might place future business advantage ahead of the welfare of defendants was unsupported by evidence.

On appeal, Koon presents nothing to refute these findings. We therefore conclude that the district court did not abuse its discretion by declining to disqualify Powell's attorney.

### E. *Double Jeopardy Claim*

■ Appellants challenge the district court's refusal to grant them a hearing on their claim of double jeopardy. Prior to trial, appellants requested an evidentiary hearing to determine if there was sufficient collusion between federal authorities and the state authorities to preclude the federal prosecution under *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959). We review the court's denial of this motion for an abuse of discretion. *United States v. Russotti,* 717 F.2d 27, 31 (2d Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1273, 79 L.Ed.2d 678 (1984).

■ The Double Jeopardy Clause of the Fifth Amendment provides "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb." Nevertheless, under the doctrine of dual sovereignty, successive prosecutions based on the same underlying conduct do not violate the Fifth Amendment's Double Jeopardy Clause if the prosecutions are brought by separate sovereigns. *Heath v. Alabama,* 474 U.S. 82, 93, 106 S.Ct. 433, 440, 88 L.Ed.2d 387 (1985); *United States v. Guy,* 903 F.2d 1240, 1242 (9th Cir.1990).

Our circuit has recognized a narrow exception to this general rule: "[i]f the second prosecution, otherwise permissible under the dual sovereignty rule, is not pursued to vindicate the separate interests of the second sovereign, but is merely pursued as a sham on behalf of the sovereign first to prosecute, it may be subject to a successful double jeopardy challenge." *Guy,* 903 F.2d at 1242; *see also United States v. Figueroa–Soto,* 938 F.2d 1015, 1018–19 (9th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1181, 117 L.Ed.2d 424 (1992). This exception is referred to as the "*Bartkus* exception" in reference to the Supreme Court case from which

18. We recognize that the district court also had an obligation to ensure that the proceedings *appeared* to be fair. *See Wheat,* 486 U.S. at 160, 108 S.Ct. at 1698. For this reason, it might be argued that rules relating to conflict must be applied prophylactically, and that we must review this case without benefit of hindsight. If we were to constrain ourselves to such an application, the result would be no different. Even at the time the district court ruled on the matter, Koon had shown little more than the appearance of a conflict. We have expressed "grave doubts" as to whether mere appearances would ever be enough to deprive a criminal defendant of the right to counsel of his choice, *United States v. Washington,* 797 F.2d 1461, 1466 (9th Cir.1986), and we note that the test formulated in *Wheat* itself directs courts to look for a *"serious potential* for conflict," rather than the mere appearance of conflict. 486 U.S. at 164, 108 S.Ct. at 1700. Here, where Powell had a strong Sixth Amendment right in retaining Stone as his attorney, we conclude that the district court did not abuse its discretion in protecting that right rather than removing what can only be characterized as the possible appearance of a highly attenuated conflict.

it was derived. *See Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959).

■ To establish double jeopardy, it is not sufficient for the defendant to show that there was cooperation between federal and state authorities; rather, the defendant must prove that the subsequent prosecuting entity is a "tool" for the first, or the proceeding is a "sham," done at the behest of the prior authority. *Figueroa–Soto,* 938 F.2d at 1019; *Guy,* 903 F.2d at 1242–43; *United States v. Bernhardt,* 831 F.2d 181, 182 (9th Cir.1987).[19] In this case, appellants ask us to remand this case for an evidentiary hearing to determine whether the federal government's prosecution was the product of state and federal collusion extensive enough to amount to a second prosecution by the state. Although we have never articulated what a defendant must show to obtain an evidentiary hearing, we have stated that he must make more than "conclusory allegations" of collusion. *Russotti,* 717 F.2d at 31.

■ Appellants point to several factors which, they contend, warrant a hearing in this case: (1) the federal investigation began when the crime occurred and remained active during the state investigation and prosecution; (2) federal and state authorities cooperated with each other, and the state delivered evidence and investigative reports to federal authorities after the state prosecution; (3) witnesses who testified in the federal trial were interviewed by the federal authorities soon after the incident; and (4) the Briseno videotape was admitted into evidence in the federal trial.

Despite these factors, appellants point to nothing that suggests the federal prosecution was merely a sham. These factors at most show cooperation between federal and state authorities. The fact that the federal government has conducted its own investigation weakens appellants' argument, as it indicates that the federal government was not a "tool" of the state authorities. *See Guy,* 903 F.2d at 1243. Moreover, the fact that evidence developed from the state trial was used in the federal trial does not create a double jeopardy problem. *Cf. Figueroa–Soto,* 938 F.2d at 1018–19 (evidence collected by federal authorities given to state authorities for state prosecution).

In sum, there is no evidence that the federal prosecution was a "sham" or a "cover" for the state prosecution. *Cf. Bernhardt,* 831 F.2d at 181–83 (remanding for further factual finding where defendant showed that state prosecutor, who could not prosecute defendant due to statute of limitations, enlisted U.S. Attorney in prosecution with the understanding that the state prosecutor would be the lead attorney in the federal case and would be paid by the state); *see also Paiz,* 905 F.2d at 1025 n. 14 (no hearing required where defense showed that federal agent was involved in state investigation and arrest and that state prosecutor was designated a U.S. attorney for the federal prosecution). The district court did not abuse its discretion in denying appellants' motions for an evidentiary hearing.

### F. Denial of Appellants' Peremptory Challenges

Appellants claim that the district court denied them the right to exercise peremptory challenges against two black jurors.

■ In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court held that the discriminatory exercise of peremptory challenges violates the equal protection clause. *Batson's* hold-

---

**19.** The *Bartkus* exception is narrow, and seldom successfully pursued. *E.g., United States v. Paiz,* 905 F.2d 1014, 1024 (7th Cir.1990) (compiling list of cases), *cert. denied,* 499 U.S. 924, 111 S.Ct. 1319, 113 L.Ed.2d 252 (1991). Our decision in *Figueroa–Soto* demonstrates the narrowness of the exception. 938 F.2d 1015. In *Figueroa–Soto,* we concluded that the *Bartkus* exception did not apply, even though the state prosecuted at the request of federal authorities; federal agents assisted the state prosecution, sat at the state prosecutor's table, and testified as witness-

es; evidence collected by federal authorities was given to state authorities for use in the state trial; the sentence of one prosecution witness was postponed until he had testified at the state trial; a federal forfeiture proceeding was delayed so as not to prejudice the state prosecution; FBI agents prepared state trial witnesses; and the state prosecutor was appointed as special assistant to the U.S. Attorney and paid by the state for the subsequent federal prosecution. *Id.* at 1018–19.

ing has been extended to peremptory challenges exercised by criminal defendants. *Georgia v. McCollum*, —— U.S. ——, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992); *United States v. DeGross*, 960 F.2d 1433, 1339–42 (9th Cir.1992) (en banc). Under *Batson*, the prosecution first must make out a prima facie case of racial discrimination; to rebut, the defense must then articulate a race-neutral explanation for the challenge. *McCollum*, —— U.S. at ——, 112 S.Ct. at 2359.[20] We review the district court's factual findings for clear error. *DeGross*, 960 F.2d at 1442.

### 1. *Juror No. 263*

Juror No. 263, a black man, provided the following answers on a questionnaire he filled out before voir dire:

> 98. (a) How would you describe the media coverage of the underlying incident between the police officers and Rodney King?
>
> _X_ Fair and accurate
>
> ____ Distorted and exaggerated
>
> (b) How would you describe the media coverage of the previous trial?
>
> _X_ Fair and accurate
>
> ____ Distorted and exaggerated
>
> . . . . .
>
> 109. What was your personal initial reaction to the verdicts in the state court trial?
>
> My personal reaction was unfair.[21]
>
> 110. Did you feel that justice had been served or were you disappointed with the verdicts?
>
> Disappointed.

When Juror No. 263 was questioned on voir dire his answers changed. He stated that he no longer thought the verdict was unfair, and explained that his ideas had changed "after listening to things" said by others during the voir dire. RT 2/22/93 at

62. He said that his opinion now was that justice had been served by the Simi Valley verdicts; he was no longer disappointed in those verdicts. He also stated that although he thought at the time the Holliday videotape was first aired that what the defendants had done was wrong, he had now changed his perception, because through the voir dire he had come to realize that he "didn't have the whole facts to base an opinion on." *Id.* at 75.

Juror No. 263 had also written on his questionnaire that what he remembered about the Rodney King case "was how bad the news people handled a very important trial." *Id.* at 61. On voir dire, he explained that in this answer he had been referring to the news media's exploitation of the event.

A defense challenge for cause was denied. The defendants then sought to exercise a peremptory challenge. The government objected on *Batson* grounds, and the district court asked the defense to articulate race-neutral reasons for the challenge.

Appellants contend that the district court erred by not first requiring the government to make out a prima facie case. At this stage, however, any error of this kind is irrelevant: "[o]nce [the party making the peremptory challenge] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [party opposing the peremptory challenge] had made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality opinion); *United States v. Changco*, 1 F.3d 837, 839–40 (9th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 619, 126 L.Ed.2d 583 (1993) (same); *United States v. Bishop*, 959 F.2d 820, 824 (9th Cir.1992) (same).[22]

---

**20.** On appeal, Koon and Powell raise not a *Batson* claim but the reverse of one: they claim that their right to exercise peremptory challenges was violated because the district court went too far in protecting *Batson* rights asserted by the government. Since the question is what the proper limits of *Batson* are, the same analytic framework applies. *See United States v. Bentley-Smith*, 2 F.3d 1368, 1373–77 (5th Cir.1993).

**21.** Throughout the voir dire, it was assumed that Juror No. 263 meant that he felt the verdicts were unfair.

**22.** *Hernandez* and the cases following it dispense with appellants' argument that "the trial court unfairly imposed a higher burden on the defense to shift the burden to the government when it exercised peremptory challenges to white jurors than it imposed on the government to shift the

The defense furnished two reasons for challenging Juror No. 263: the juror's answers about press coverage were inconsistent both within the questionnaire and with his answers in court; and Juror No. 263 had stated on his questionnaire that he was disappointed in the Simi Valley verdicts, and found them unfair. To refute these reasons, the government argued (1) that Juror No. 263's answers regarding the press were not inconsistent, and (2) that Juror No. 263's answers on the questionnaire regarding the Simi Valley verdicts were superseded by the more favorable answers he gave on voir dire, and that the defense had accepted non-minority jurors who had changed their answers in apparent response to the educative process of the voir dire. The government also argued that the defense had engaged in a pattern of exercising peremptory challenges against minority jurors, and that defense counsel had questioned minority jurors vigorously, in an attempt to unearth something which would serve as a basis for disqualification, while using voir dire with white jurors as an opportunity to educate and indoctrinate.

The district court, after hearing argument from all counsel, stated as follows:

> [T]he Court believes and so rules that the government has made a prima facie showing and that considering the totality of the circumstances that do pertain, the explanation for the challenge is insufficient, it does not meet the test and, therefore, the challenge will not be allowed.

RT 2/22/93 at 105. In reviewing this finding, we must consider "all relevant circumstances," including any pattern of peremptory challenges against minority jurors and the questions and statements made during voir dire. *Batson*, 476 U.S. at 96–97, 106 S.Ct. at 1723.

We do not find in the record clear-cut evidence either way. The defendants' claim that Juror No. 263's answers about the press were inconsistent appears weak: media coverage can be exploitative and accurate at the same time. The defendants' stated concerns about Juror No. 263's reaction to the Simi Valley verdicts appear to stand on firmer ground, but in at least one instance, the defense accepted without challenge a non-minority juror who professed to have been shocked by the Simi Valley verdicts, and who stated that she had anticipated on the basis of the Holliday video that at least one of the defendants in the state prosecution would be convicted. The record reveals that the defense attorneys engaged in far more vigorous questioning of Juror No. 263 than of the non-minority jurors who were questioned on the same day, although there are also suggestions in the record that those jurors may have appeared desirable to the defense for reasons other than race (e.g., positive contacts with or friends in law enforcement). Minority jurors questioned on previous days were subjected to vigorous voir dire by defense counsel; several non-minority jurors, however, were closely questioned as well. After the questioning on previous days, the defendants collectively or individually exercised against minority jurors two of the three peremptory challenges they ultimately used. A third minority juror, No. 598, initially was not challenged by the defense.

▇▇▇ The evidence points in both directions. In such a situation, we must defer to the district court's factual findings: " 'where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.' " *Hernandez*, 500 U.S. at 369, 111 S.Ct. at 1871 (plurality) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). We note that in this case the evidence was bound up at every stage with the need to make determinations of credibility. As the Supreme Court has explained,

> [i]n the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney

---

burden to the defense to justify its challenges to black jurors." Br. of Powell at 31. Since the "height" of the initial burden is moot at this stage, differing heights for different parties are of no significance.

who exercises the challenge. As with the state of mind of a juror, evaluation of [that attorney's] state of mind based on demeanor and credibility lies "peculiarly within a trial judge's province."

*Hernandez,* 500 U.S. at 365, 111 S.Ct. at 1869 (quoting *Wainwright v. Witt,* 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985)). Here, the district court's observation of demeanor was particularly important, since the court had to assess not only the credibility of the attorneys, but also the credibility of those jurors who purported to have been reformed through the educative process of the voir dire. The two credibility assessments were interrelated: the more convincing the juror, the less believable the attorney who attempted to exercise the challenge.

Determinations as to lawyer credibility were clearly the crux of the matter in this case. As the Fifth Circuit recently noted in the context of a *McCollum* challenge, "the ultimate inquiry for the judge is not whether counsel's reason is suspect, or weak, or irrational, but whether counsel is telling the truth in his or her assertion that the challenge is not race-based." *United States v. Bentley–Smith,* 2 F.3d 1368, 1375 (5th Cir. 1993). Recognizing that on this most crucial issue, "[w]e have only a cold transcript to guide us while the trial judge was there to observe the jury selection—day in and day out," *Burks v. Borg,* Nos. 93–15263/16546, 1994 WL 280285 at *4 (9th Cir. June 27, 1994), we will not substitute our judgment for that of the district court.

### 2. *Juror No. 598*

The jury was sworn on February 22, 1993. On February 23, 1993, Koon's attorney informed the court that Juror No. 421, a reserve police officer who had been excused for cause, had contacted him: Juror No. 421 had related to Koon's attorney that Juror No. 598, a black woman seated on the jury, had made various disdainful comments to him regarding defense strategy and the racial composition of the jury. Koon moved to reopen the voir dire. The court summoned Juror No. 421.

In court, Juror No. 421 testified that when he had told Juror No. 598 that he felt she was "good jury material," she responded that the Simi Valley jury had been all white; that "they" (the defense attorneys) had managed to get all the blacks kicked off; and that they would most likely do the same in the federal trial.

Koon renewed his motion to reopen voir dire on the basis that the statements attributed to Juror No. 598 were inconsistent with her answers on the questionnaire and on voir dire. Koon also moved for a mistrial, and all defendants joined. The court took the motions under submission. The following day, the court denied the mistrial motions and informed counsel that it would consider a brief questioning of Juror No. 598.

On February 25, 1993, the court and all counsel met with Juror No. 598 in chambers, and the court questioned Juror No. 598 about Juror No. 421's allegations. Juror No. 598 denied them all. The court asked counsel if they had anything else. Only the government attorney replied, and he said that he had nothing. The in-chambers conference was adjourned. In open court, Wind again moved for a mistrial, and Briseno joined the motion. Koon and Powell did not. The motion was denied. The trial then commenced, with Juror No. 598 seated on the jury.

Appellants now argue that the district court erred because "it denied the defense the ability to exercise a peremptory challenge." Br. of Appellant Powell at 31. The record does not support this argument. Rather, the record reveals that Koon and Powell simply dropped the issue after the *in camera* questioning of Juror No. 598.[23]

■■■ We therefore review the case for plain error affecting substantial rights. *United States v. Olano,* —— U.S. ——, ——, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993); *United States v. Sterner,* 23 F.3d 250, 251 (9th Cir.1994). Assuming without deciding that substantial rights were at issue here, we see no plain error. When a court is informed that a juror may have failed to disclose a

---

23. Koon and Powell did not join in Wind's post-*in camera* mistrial motion, although on other

occasions when the same issue was raised, Koon and Powell joined. RT 2/23/94 at 113.

relevant fact during voir dire, the proper course of action, once the jury has been sworn, is for the court to question the juror and excuse her if necessary, not to reopen the whole jury selection process. *See United States v. Berryhill,* 880 F.2d 275, 279 (10th Cir.1989) (affirming conviction over defendant's contention that he was denied his right to exercise peremptory challenges, where information about jurors which should have been disclosed on voir dire was disclosed after first day of trial, and where district court questioned jurors, discharged one of the two, and seated an alternate), *cert. denied,* 493 U.S. 1049, 110 S.Ct. 853, 107 L.Ed.2d 846 (1990). The district court followed the procedure which has been endorsed by this court in cases of juror bias or misconduct, carefully questioning both the juror whose impartiality had been attacked and other relevant witnesses, and inviting counsel to do the same. *See United States v. Armstrong,* 909 F.2d 1238, 1244 (9th Cir.), *cert. denied,* 498 U.S. 870, 111 S.Ct. 191, 112 L.Ed.2d 153 (1990); *United States v. Sears,* 663 F.2d 896, 899–900 (9th Cir.1981), *cert. denied,* 455 U.S. 1027, 102 S.Ct. 1731, 72 L.Ed.2d 148 (1982). The district court found that Juror No. 598 was not biased, and nothing in the record establishes that that finding was clearly erroneous. We find no error here, let alone the plain error which warrants reversal where a claim has been abandoned below.

### G. *Prosecutorial Misconduct*

 Appellants argue that several statements made by the prosecution during its rebuttal closing argument were improper and prejudicial. Because appellants did not make a contemporaneous objection to any comments they now challenge, we review their claims for plain error. *United States v. Young,* 470 U.S. 1, 16, 105 S.Ct. 1038, 1046–47, 84 L.Ed.2d 1 (1985). "A plain error is a highly prejudicial error affecting substantial rights." *United States v. Dischner,* 974 F.2d 1502, 1515 (9th Cir.1992) (internal quotations omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993).

 Prosecutors may not make comments calculated to arouse the passions or the prejudices of the jury. *Viereck v. United States,* 318 U.S. 236, 247–48, 63 S.Ct. 561, 566, 87 L.Ed. 734 (1943); *Commonwealth of Northern Mariana Islands v. Mendiola,* 976 F.2d 475, 486–87 (9th Cir.1992). As the D.C. Circuit has stated:

> A prosecutor may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence. Jurors may be persuaded by such appeals to believe that, by convicting a defendant, they will assist in the solution of some pressing social problem. The amelioration of society's woes is far too heavy a burden for the individual criminal defendant to bear.

*United States v. Monaghan,* 741 F.2d 1434, 1441 (D.C.Cir.1984) (internal citations omitted), *cert. denied,* 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985); *see also Northern Mariana Islands,* 976 F.2d at 486–87; *United States v. Solivan,* 937 F.2d 1146, 1150–55 (6th Cir.1991).

While recognizing that prosecutors may not appeal to the passions of the jury, in analyzing the effect of a comment upon the jury we accord due respect to the common sense of jurors. The Supreme Court has stated that

> [i]solated passages of a prosecutor's argument, billed in advance to the jury as a matter of opinion not of evidence, do not reach the same proportions [as "[t]he 'consistent and repeated misrepresentation' of a dramatic exhibit in evidence"].... [A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through a lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.

*Donnelly v. DeChristoforo,* 416 U.S. 637, 646–47, 94 S.Ct. 1868, 1873, 40 L.Ed.2d 431 (1974) (quoting *Miller v. Pate,* 386 U.S. 1, 6, 87 S.Ct. 785, 787, 17 L.Ed.2d 690 (1967)).

Appellants challenge several remarks made by the prosecution in its rebuttal clos-

ing argument. We examine each comment in turn.

■■■ Appellants first challenge statements telling the jury that they are "the conscience of the community." [24] An appeal to the jury to be the conscience of the community is not impermissible unless it is "specifically designed to inflame the jury." *United ed States v. Williams,* 989 F.2d 1061, 1072 (9th Cir.1993) (internal quotations omitted); *United States v. Lester,* 749 F.2d 1288, 1301 (9th Cir.1984). In this case, when the prosecutor's statement is considered in context, it is clear that it was not designed to inflame the jury, but rather to explain to jurors that they were in the position to determine whether the charged conduct comported with community standards of reasonableness. The reference was not accompanied by any suggestion of the consequences of a particular verdict, nor did the prosecutor suggest to the jury that it had a direct stake in the outcome of the case. *See United States v. Kopituk,* 690 F.2d 1289, 1342–43 (11th Cir. 1982), *cert. denied,* 463 U.S. 1209, 103 S.Ct. 3542, 77 L.Ed.2d 1391 (1983). The comment did not cross the line "demarcating permissible oratorical flourish from impermissible comment calculated to incite the jury against the accused." *Lester,* 749 F.2d at 1301 (quotations omitted).

■■■ Appellants also challenge the prosecutor's statement that the jury would have to decide what conduct is "acceptable by your police" and what conduct "violates the law." They contend that this statement suggested that the jury was obligated to decide more than just this case. We disagree. In order to decide whether appellants used unreasonable force, the jury was required to decide whether appellants' actions were acceptable or whether those actions violated the law.

These comments did not place upon the jurors the burden of maintaining social order. They were not improper.

■■■ Appellants next challenge the prosecutor's reference to the Constitution, and contend that the prosecutor told the jury that the survival of the Constitution rested on their verdict. Again, we believe this ascribes an unreasonable meaning to the prosecutor's statements. A jury would interpret the prosecution's references the Constitution to assert that it is their job to interpret and apply the Constitution, and not as a statement that the Constitution will collapse if there were an acquittal. *Donnelly,* 416 U.S. at 647, 94 S.Ct. at 1873. The reference was within the bounds of advocacy permitted to the prosecutor.

■■■ Appellants also argue that the prosecutor invited jurors to convict appellants in order to influence the manner in which police officers are trained to use force. During closing argument, government counsel posed the rhetorical question:

> But the real question here is a little different. Knowing what you know about Sergeant Conta and about Sergeant Duke, which of those two officers would you want teaching recruits how much force can be used against the citizens of this community? That's the real question, and you know the answer.

RT 4/10/93 at 75.

We do not understand this comment to invite jurors to convict defendants in order to influence the manner in which police are trained. *Donnelly,* 416 U.S. at 647, 94 S.Ct. at 1873. The remark was made in response to defense closing arguments, in which counsel compared the testimony of Conta, the government use-of-force expert, and Duke, the defense use-of-force expert. Defense

---

24. Counsel stated:
Judge Davies will give you your break, and then he'll instruct you in the law, and you will walk into the jury room to deliberate, and you will leave this courtroom, and convinced and confident with the truth, and you will leave with your collective good common sense, because ladies and gentlemen of the jury, *you're the conscience of the community. You decide what conduct is acceptable by your police. And what conduct violates the law.* Defendant

Koon and the other defendants beat a man who was not combative, who was not an aggressor until he begged for mercy, knowing it was wrong.... *There are some countries where people can be beaten by the police until they beg the police to stop, but not in this country. Not now, not 200 years ago when this Constitution was written, and with your decision, not ever.*
RT 4/10/93 at 107–08 (emphasis added).

counsel had asked the jurors to consider which officer—Conta or Duke—they would prefer to call in the middle of the night when they needed help, and suggested that the jurors would prefer Duke. In the government's rebuttal, counsel compared the testimonies of Duke and Conta, and then made the challenged comment. In this context, a jury would understand the prosecutor's comments as a challenge to Duke's opinion regarding what is reasonable and unreasonable in the use of force. The comment was not improper.

The final comment to which appellants object is troubling. During the trial, the government had emphasized that appellants failed to write in their police reports that King was on the ground when most of the force was used, and argued that this omission occurred because appellants knew that the use of force was unreasonable. In response, defense counsel suggested that people often make mistakes about what they see and suggested that when the jury first saw the video, they noticed different things. On rebuttal, government counsel responded:

Now, how does Mr. Stone explain the lies and omissions? Well, he tells you that everyone sees things differently....

When the video was played people may have noticed different details about what was occurring in the video, but there was one thing that everyone from Paris to Tokyo noticed, one thing that everyone saw. There was one thing that caused horror and outrage throughout this world. There was one thing that neither you nor anyone else missed when they saw that video tape. And the thing that everybody saw, that everybody was so outraged about was that the defendants were beating a man who was on the ground. That's why there was such outrage. That's why there was such uproar.

RT 4/10/93 at 81–82.

■ These remarks regarding the "horror and outrage" evoked from "Paris to Tokyo" by the Holliday video went beyond the bounds of appropriate advocacy and were improper. In this case, the worldwide broadcast of the Holliday videotape and the acquittal of appellants by the Simi Valley jury sparked widespread rioting and general public outrage of which the jurors could not help but be aware. In this context, the prosecutor's references to public outrage could easily incite the passions, fears, and prejudices of the jurors, remind them of the social ramifications of their verdict, and persuade them to convict the defendants for reasons irrelevant to appellants' guilt.

■ Even when a remark is improper, however, we can reverse only when the statement substantially prejudices a defendant's trial. E.g., Territory of Guam v. Quichocho, 973 F.2d 723, 727 (9th Cir.1992), cert. denied, — U.S. —, 113 S.Ct. 1014, 122 L.Ed.2d 162 (1993); Lester, 749 F.2d at 1301. While we certainly do not condone the government's behavior, we also cannot find that it constitutes plain error. We rely on several factors to reach this conclusion.

■ First, appellants have drawn a few sentences from a trial that lasted over a month and from detailed closing arguments that lasted many hours. The remarks were not part of a series of improper comments by the prosecutor, but were in fact made in response to defense arguments: in using the phrase "Paris to Tokyo," government counsel merely was repeating a term previously used by defense counsel to attack King's credibility. See Monaghan, 741 F.2d at 1443 & n. 42. The misconduct by the prosecution was partially invited, isolated, and of limited severity. See Williams, 989 F.2d at 1072; Monaghan, 741 F.2d at 1443.

Second, government counsel, defense counsel, and the district court all admonished the jurors to base their verdict only on the evidence before them, and to ignore what they knew about the first trial or what the possible ramifications of any verdict might be. The court also instructed the jurors to rely only on the evidence introduced at trial, and reminded them that oral argument is not evidence. Such instructions dilute the potential prejudice arising from improper statements. E.g., Williams, 989 F.2d at 1072; Lester, 749 F.2d at 1301; United States v. Flake, 746 F.2d 535, 542 (9th Cir.1984), cert. denied, 469 U.S. 1225, 105 S.Ct. 1220, 84 L.Ed.2d 360 (1985).

Third, unlike cases in which there is little evidence on which the jurors could base a conviction, in this case there was substantial independent evidence to support a finding of guilt. *See United States v. Modica,* 663 F.2d 1173, 1182 (2d Cir.1981), *cert. denied,* 456 U.S. 989, 102 S.Ct. 2269, 73 L.Ed.2d 1284 (1982). Finally, the verdicts acquitting two police officers and finding two guilty is indicative of the jury's ability to weigh the evidence without prejudice. *Monaghan,* 741 F.2d at 1443 n. 45.

In light of these factors, we conclude that the jury's ability to weigh the evidence impartially was not materially affected by the prosecutor's improper remarks. *Cf. Williams,* 989 F.2d at 1072; *United States v. Polizzi,* 801 F.2d 1543, 1558 (9th Cir.1986).

## H. *Jury Instructions*

After closing arguments, the district court instructed the jury that the government had the burden of proving beyond a reasonable doubt, *inter alia,* (1) that the conduct of the defendants deprived King of a right secured by the Constitution or other federal law; and (2) that the defendants acted willfully.

In the indictment, Powell, Briseno, and Wind were charged with depriving King of the right to be free from unreasonable force in the course of an arrest. Koon was charged separately under Count 2 with depriving King of "the right preserved and protected by the Constitution of the United States not to be deprived of liberty without due process of law, including the right to be kept free from harm while in official custody." Consequently, with respect to deprivation of rights, the jury was given separate instructions as to Koon.

Koon contends that the instructions relating to deprivation of rights in his case were erroneous. Both Koon and Powell contend that the district court's instructions on willfulness were erroneous.

### 1. *Deprivation of Rights by Koon*

■] The district court instructed the jury as follows:

> Count 2 charges that Defendant Koon did willfully commit other officers to un-

lawfully assault Rodney King, who was then in the custody of those officers.

> The Fourteenth Amendment right to be kept free from the deprivation of liberty without due process of law includes the right to be kept free from an unreasonable use of force while in official custody.

> A police officer, having a right to arrest a person who has committed a crime, has an equal duty to protect that person from unreasonable assault or injury from any source while that person is in official custody. In other words, a police officer has a duty to insure that persons in official custody are not unreasonably assaulted by others, including police officers.

> A person is in official custody if, in light of all circumstances surrounding the incident, a reasonable person in that situation would have believed he or she was not free to leave.

RT 4/10/93 (Jury Instructions) at 15–16. The court then defined unreasonable force, concluding that "[t]he question is whether the totality of the circumstances justifies the force used during the arrest." *Id.* This is the test used to determine whether the force used in the course of an arrest is unreasonable in violation of the Fourth Amendment. *Graham v. Connor,* 490 U.S. 386, 395–97, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989).

Koon argues on appeal that the district court erred by drawing the definitions of both unlawful force and custody from the context of Fourth Amendment law, when the indictment charged him with depriving King of Fourteenth Amendment rights. According to Koon, the Fourteenth Amendment standard, which should have been applied in his case, affords greater protection to civil rights defendants, since under this standard, force is unlawful only if it is "shocking to the conscience" or "intended as punishment," rather than merely if it is "objectively unreasonable." Koon relies heavily on *United States v. Cobb,* 905 F.2d 784 (4th Cir.1990), *cert. denied,* 498 U.S. 1049, 111 S.Ct. 758, 112 L.Ed.2d 778 (1991), a criminal prosecution brought under 18 U.S.C. § 242, in which the Fourth Circuit held that the district court had erred by giving a *Graham*-type excessive force instruction where the victim was a

pretrial detainee, and hence where the victim's right to be free from excessive force was governed by the Fourteenth Amendment. *Id.* at 788–89.

■■■] We must determine whether Koon, like the defendant in *Cobb,* was entitled to have the jury instructed under the Fourteenth Amendment standard. We review de novo the question of whether a jury instruction correctly sets forth the elements of a statutory crime. *United States v. Reese,* 2 F.3d 870, 883 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 928, 127 L.Ed.2d 220 (1994).

■■■■] We conclude that the district court stated the law correctly. The indictment charged Koon with depriving King of Fourteenth Amendment rights. This circuit, like others, has recognized that a person in official custody has a right to be free from harm inflicted by third persons, and that an official who willfully subjects a custodial subject to a deprivation of that right is subject to criminal liability. *United States v. Reese,* 2 F.3d at 887–90 (officials charged with violating victim's right to be kept free from harm while in custody); *United States v. McKenzie,* 768 F.2d 602, 604 (5th Cir.1985) (same), *cert. denied,* 474 U.S. 1086, 106 S.Ct. 861, 88 L.Ed.2d 900 (1986); *United States v. Lynch,* 189 F.2d 476, 478 (5th Cir.) (officials charged with violating victims' right "not to be subjected to cruel and inhuman treatment or punishment while in custody, control, or under arrest"), *cert. denied,* 342 U.S. 831, 72 S.Ct. 50, 96 L.Ed. 629 (1951).[25]

The right of the custodial subject to be protected from harm is firmly rooted in substantive due process jurisprudence: "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety." *DeShaney v. Winnebago County Soc. Servs. Dept.,* 489 U.S. 189, 199–200, 109 S.Ct. 998, 1005–06, 103 L.Ed.2d 249 (1989). In this circuit, that duty obtains not only when the victim is in custody, but also when the state has created the danger to which the victim is exposed. *Wood v. Ostrander,* 879 F.2d 583, 589–90 (9th Cir.1989) (victim in high crime area raped when police officer impounded car in which victim was passenger, leaving her stranded), *cert. denied,* 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *L.W. v. Grubbs,* 974 F.2d 119 (9th Cir.1992) (prison nurse raped by violent sex offender assigned to work with her; state knew offender was likely to rape again, but did not tell nurse of his proclivities), *cert. denied,* —— U.S. ——, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993).

■■■] The right which is established in these substantive due process cases is not the narrow right to be protected from constitutional wrongs committed by third persons. Rather, because the individual has been placed in a dependent and helpless position, she is entitled to the broader right to be protected from *harm.* In *Lynch,* in *Grubbs,* and in *Wood,* the third persons who inflicted the victims' injuries, in fact, were not state actors. They were private citizens whose own actions could not have given rise to liability under § 242 or § 1983. The state actors—the defendants who failed to intervene, or who created the danger—were alone responsible for *constitutional* crimes or

---

25. There is another route to police officer liability under the civil rights statutes for injuries perpetrated by third persons. Pursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen. *E.g., O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988); *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir.1986); *Bruner v. Dunaway,* 684 F.2d 422, 425–26 (6th Cir.1982), *cert. denied,* 459 U.S. 1171, 103 S.Ct. 816, 74 L.Ed.2d 1014 (1983); *Putnam v. Gerloff,* 639 F.2d 415, 423 (8th Cir. 1981); *Byrd v. Brishke,* 466 F.2d 6 (7th Cir. 1972). In these cases, the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows. Thus an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights.

The government chose not to rely on this line of authority in drafting the indictment, perhaps because *Byrd v. Brishke,* the leading case in this line, is explicitly premised on principles of tort liability. 466 F.2d at 10–11. We note that *Reese,* which was decided after the trial in this case, strongly suggests that *both* approaches are available in a criminal case. *See* 2 F.3d at 884 & n. 20, 888–89.

torts. These cases make clear that the "harm" from which the custodial victim has a right to be protected is not necessarily an independent constitutional violation but rather need be no more than a common-law crime or tort. Thus in this case, there was no reason for the court to instruct the jury that Koon was liable only if he permitted third persons to inflict force which would amount to an independent Fourteenth Amendment violation shocking to the conscience. Indeed, such an instruction would have been erroneous.

■■■ The district court instructed the jury that King had a right to be kept from "an unreasonable use of force" while in custody—a Fourth Amendment standard. This was altogether correct. If Powell, Briseno, and Wind had inflicted only those injuries they were permitted to inflict as police officers subduing an arrestee—if they had used only reasonable force—there would have been no harm from which Koon was obligated to protect King. Because the third-party actors were officers attempting to make an arrest, Koon's Fourteenth Amendment duties to the custodial subject were to protect against only such force as was unreasonable.[26]

This analysis finds support in *Reese,* where, as here, a police sergeant was convicted under 18 U.S.C. § 242 of violating the rights of custodial subjects by deliberately failing to intervene as his officers beat them. 2 F.3d at 887–88. The excessive force instruction given to the jury set forth a Fourth Amendment test of reasonableness under the circumstances—and was approved by this court. 2 F.3d at 891, 898–99. *Reese* thus recognized a custodial subject's substantive due process right to be protected from Fourth Amendment violations by third persons.

Koon attempts to distinguish *Reese* by arguing that it was permissible for the court to give a Fourth Amendment excessive force instruction there only because the indictment in that case left it unclear as to whether the defendants were charged under the Fourth or the Fourteenth Amendment. As we have explained, however, even in the context of an alleged deprivation of Fourteenth Amendment rights, it was altogether proper for the district court to use a Fourth Amendment excessive force benchmark when describing the harm an officer was obligated to protect a custodial suspect from suffering at the hands of other police officers.[27]

■■■ Koon next contends that the jury should have been instructed that a person is in official custody only if he has been taken to "a police facility or other pretrial detention facility." But even assuming that the rights of all pretrial detainees to be free from excessive force are governed by substantive due process standards, this does not mean that a person has substantive due process rights only if he is a pretrial detainee. As in the § 242 cases cited above, King's right to protection arose when he came into custody—not when he was placed in a "facility."

The district court instructed the jury that a person is in official custody if, "in light of all circumstances surrounding the incident, a reasonable person in that situation would have believed he or she was not free to leave." RT 4/10/93 (Jury Instructions) at 16. Although this standard is taken from the Fourth Amendment case of *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), the same definition of "custody" applies in the Fourteenth Amendment context. Indeed, Koon

---

**26.** That does not mean that Koon was criminally liable for *any* Fourth Amendment violation by the other officers. His criminal liability was premised on a *willful* failure to intercede. Thus if the blows had been struck so rapidly that Koon had no realistic opportunity to intervene, he would not be liable. See *O'Neill,* 839 F.2d at 11.

The district court recognized this point in its sentencing memorandum: although the court suggested strongly that Briseno's stomp may have been a violation of King's Fourth Amendment rights, the court did not hold Koon ac-

countable for that stomp, since it was so sudden that Koon could not have anticipated it. *Koon,* 833 F.Supp. at 779.

**27.** Koon also points out that the defendants in *Reese* were charged with conspiracy, while he was not. The police sergeant in *Reese,* however, was charged with several substantive counts under 18 U.S.C. § 242 as well as with conspiracy under 18 U.S.C. § 241. The court upheld his conviction on both the conspiracy count and the substantive counts. 2 F.3d at 875, 877, 887–90.

does not suggest any alternative "Fourteenth Amendment" definition of custody. He offers only the logically fallacious argument that because all pretrial detainees have substantive due process rights, a person must be a pretrial detainee to enjoy those rights.

In any event, Koon's custody argument is laid to rest by *Reese*, in which the court upheld a conviction based on the defendant's willful deprivation of a victim's right to be kept free from harm while in official custody, the only "custody" relevant to the counts on which defendant was convicted consisted of investigatory stops accompanied by pre-arrest scuffles between officers and suspects. 2 F.3d at 875, 877, 887–90. Since that much was clearly present in this case as well, the district court did not err by failing to tell the jury that it had to find more.[28]

### 2. *Willfulness*

The court gave the following instructions on willfulness:

[1] An act is done willfully if it is done voluntarily and intentionally, and with a specific intent to do something this law forbids; that is, with an intent to violate a protected right.

. . . . .

[2] In Count 1, the required specific intent is the intent to use more force than is reasonable under all of the circumstances.

[3] In Count 2, the required specific intent is the intent to refrain from protecting a person from an unreasonable use of force while that person is in official custody.

. . . . .

[4] It is not necessary for you to find that a defendant was thinking in constitutional terms at the time. You may find that a defendant acted with the required specific intent, even if you find that he had no real familiarity with the Constitution or with the particular constitutional right involved, provided that you find that the defendant

intended to accomplish that which the Constitution forbids.

[5] The government may meet its burden, even if the defendant was motivated by fear, anger, or some other emotion, provided that the intent which I have described to you is present.

. . . . .

[6] The term "willfully" as used in these instructions to describe the alleged state of mind of a defendant means that he knowingly acted or failed to act deliberately and intentionally as contrasted with accidentally, carelessly or unintentionally.

RT 4/10/93 (Jury Instructions) at 17–20.

Appellants concede that ¶¶ 2 and 3 are correct statements of the law. They contend, however, that the effect of ¶¶ 4, 5, and 6 was to allow the jury to convict on the basis of acts which were merely volitional, rather than undertaken with the specific intent to violate King's rights. If appellants are correct, the problem is serious: "the violation of a federally protected right and the specific intent to violate that right are *separate* elements of the crime established by [§ 242]." *Reese*, 2 F.3d at 884 (emphasis in original).

■ We review de novo whether the district court has correctly stated the law as to the elements of the crime, but review the manner of expression for abuse of discretion. *Id.* at 883. We must decide whether the jury instructions, taken "as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Joetzki*, 952 F.2d 1090, 1095 (9th Cir.1991).

■ Paragraph 4 is a correct statement of the law. While it may appear paradoxical to say both that a defendant must have the specific intent to violate the Constitution and that the defendant may have that intent even if he is not "thinking in constitutional terms," this seeming paradox is explained by the fact that "willfulness" encompasses "'reckless disregard of a constitutional requirement that has been made specific and definite.'"

---

**28.** Koon also argues that there was insufficient evidence to sustain his conviction under Fourteenth Amendment standards of force and custody. Since the jury was properly instructed as to the Fourth Amendment definitions of those terms, and Koon does not argue that the evidence was insufficient to sustain a conviction under those standards, Koon's sufficiency of the evidence argument fails.

*Reese,* 2 F.3d at 881 (quoting *Screws v. United States,* 325 U.S. 91, 105, 65 S.Ct. 1031, 1037, 89 L.Ed. 1495 (1945)); *see also United States v. Gwaltney,* 790 F.2d 1378, 1386 (9th Cir.1986), *cert. denied,* 479 U.S. 1104, 107 S.Ct. 1337, 94 L.Ed.2d 187 (1987). Indeed, the very language defendants complain of in ¶ 4 was approved by *Reese.*

Paragraph 5 is also correct. After noting that the government could meet its burden of proving specific intent even if a defendant was motivated by fear, anger, or some other emotion, the court reiterated that the government still had to prove "the intent which I have described to you." Since the court's earlier instruction defined specific intent correctly, this later instruction could not be incorrect unless the statement about motivation and emotions was somehow wrong. Appellants do not claim that it was.

Finally, ¶ 6 does not dilute the definitions of specific intent which appellants concede were correct. It simply makes clear that negligence or inadvertence do *not* amount to willfulness. This statement is far more helpful than hurtful to appellants.

We conclude that there was no error in the jury instructions.[29]

I. *Sufficiency of the Evidence to Support Powell's Conviction*

There is sufficient evidence to support a conviction if, " 'reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt.' " *United States v. Bishop,* 959 F.2d 820, 829 (9th Cir.1992) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)).

 Powell contends that the evidence was insufficient to establish either the unreasonableness of the force he used or his will-

fulness. On the first point, he focuses only on the force used from 1:07 to 1:26 in the videotape—the period in which the district court, in its sentencing memorandum, concluded that criminal conduct occurred. Powell points out that with respect to earlier portions of the videotape, the district court concluded that his blows were a reasonable response to King's movements. Powell then argues that since King moved again after being stomped on by Briseno, the blows he inflicted after that also were reasonable.

We reject this argument. In reviewing the sufficiency of the evidence, we are not bound by the district court's findings at sentencing. The comparison Powell draws between the earlier and the later portions of the videotape, since it is based on the district court's sentencing memorandum, is without force in this context. But even if that were not so, Powell's argument fails as a factual matter. The district court found that the movement of King's body after Briseno's stomp was involuntary. Powell does not contend that there was insufficient evidence for the jury to have made this same finding, or to have found that he was aware of the involuntary nature of King's movements. It is simply disingenuous to say that an involuntary movement in response to a stomp poses the same threat as a voluntary movement made in an attempt to resist arrest.

Powell also argues that the evidence was insufficient to show that his actions from 1:07 to 1:26 were willful. He points out that he was not found guilty of being an aider and abettor of Briseno. However, since the jury acquitted Briseno (because it found the stomp to be reasonable, or because it found the stomp not to be a willful use of unreasonable force, or for some other reason we know not of), the jury had no basis for convicting Powell of aiding and abetting Briseno. 18 U.S.C. § 2; *United States v. Powell,* 806

---

**29.** Appellants also argue that in closing, the government misled the jury about the nature of the intent it was required to prove. The prosecutor stated that "[i]t is not, I repeat it is not, what these defendants think was reasonable. It is what a reasonable and ordinary police officer thinks is reasonable that is the standard you must employ." RT 4/10/93 (AM) at 99. That statement was made, however, "on the issue of

reasonableness" of the force. *Id.* The statement did not refer to intent, which the prosecutor addressed earlier in his argument by reading from the instructions soon to be given by the court. The prosecutor kept specific intent (a subjective element) and reasonableness of the force under the Fourth Amendment (an objective element) quite distinct.

F.2d 1421, 1424 (9th Cir.1986) (in order to sustain an aiding and abetting conviction, "courts in this circuit, as in others, continue to require evidence showing that a principal offense has been committed—including requiring evidence that some principal had the requisite intent"). Yet the jury could still find that Powell willfully used unreasonable force in delivering the blows that followed Briseno's stomp.

The videotape and the testimony of the government witnesses who interpreted it provided ample evidence that Powell's conduct was unreasonable. The jury was instructed that it was permitted to infer "that a person ordinarily intends all natural and probable consequences of an act knowingly done." RT 4/10/93 (Jury Instructions) at 18. That inference was available here, and would allow the jury to infer that unreasonable force was intended. In addition, Powell's remarks to the dispatcher after King had been handcuffed, and his remarks to King at the hospital were in themselves sufficient to support a finding of willfulness.

### J. Sentencing Issues

Appellants were sentenced under § 2H1.4 of the United States Sentencing Commission *Guidelines Manual,* the provision pertaining to violations of 18 U.S.C. § 242. Section 2H1.4 provides for a base offense level of either 10, or 6 plus the offense level applicable to "any underlying offense," whichever is greater. "Underlying offense" is defined as "any offense under federal, state, or local law other than an offense that is itself covered under Chapter Two, Part H, Subpart 1." U.S.S.G. § 2H1.1, comment. (n.1).

In this case, the underlying offense was aggravated assault, which carries a base offense level of 15, U.S.S.G. § 2A2.2, to which was added 6 for a total of 21. The district court applied an upward adjustment of 4 for use of a dangerous weapon (U.S.S.G. § 2A2.2(b)(2)(B)), and a second upward adjustment of 2 for bodily injury (U.S.S.G. § 2A2.2(b)(3)(A)), for a total of 27.

The court declined to impose a four-level upward adjustment for serious bodily injury, because it found that King's serious injuries—a fractured leg, and head and facial injuries—were sustained at a time when the officers were using lawful force. The court found that the force applied by the officers during the first 55 seconds of the Holliday videotape was a legitimate response to the threat King apparently posed. After 55 seconds, King became still. At 1:05, Briseno stomped on King's upper thorax, and King's body writhed involuntarily. Powell and Wind moved in and struck a new series of baton blows, between 1:07 and 1:26 on the videotape. These last blows, and these only, according to the district court, were unlawful. *Koon,* 833 F.Supp. at 779–80.

The district court departed downward five levels for victim misconduct and three levels based on a combination of other factors.[30] The government appeals from both of the downward departures and from the failure to adjust upward for serious bodily injury. We review de novo whether the district court had authority to depart. *United States v. Lira–Barraza,* 941 F.2d 745, 746 (9th Cir.1991) (en banc). We review the factual findings concerning serious bodily injury for clear error. *United States v. Chapnick,* 963 F.2d 224, 226 (9th Cir.1992).

The Sentencing Commission has instructed courts to treat each guideline as carving out a "heartland," defined as the "set of typical cases embodying the conduct that each guideline describes." U.S.S.G. Ch. 1, Pt. A, § 4(b). Departure may be warranted in cases falling outside the heartland—atypical cases "to which a particular guideline linguistically applies but where conduct significantly differs from the norm." *Id.* The aggravating or mitigating circumstances which justify a departure must be circumstances of a kind or a degree "not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." 18 U.S.C. § 3553(b); U.S.S.G. § 5K2.0, p.s.

Both Congress and the Sentencing Commission have placed restrictions on the types of factors which may be considered in sen-

---

**30.** After the departures, the applicable range given a Criminal History Category of I was 30–37 months. Both appellants were sentenced to 30 months in prison.

tencing. *E.g.,* 28 U.S.C. § 994(d); *see also* U.S.S.G. Ch. 1, Pt. A, § 4(b), intro. comment. We have frequently recognized that any sentence must be consistent with the structure of and the policies behind the federal sentencing statutes and the Guidelines. 18 U.S.C. § 3553(a); *United States v. Valdez–Gonzalez,* 957 F.2d 643, 647 (9th Cir.1992); *United States v. Anders,* 956 F.2d 907, 914, (9th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1592, 123 L.Ed.2d 158 (1993).

### 1. *Three–Level Downward Departure*

The district court based the three-level downward departure on a combination of three factors: (1) the "additional punishment" appellants would receive on account of their unusual susceptibility to prison abuse and the administrative LAPD proceedings to which they would be subjected; (2) the extreme absence of a need to protect the public from future wrongdoing; and (3) the unfairness of successive state and federal prosecutions for the same conduct. The court recognized that none of these factors independently warranted a departure, but concluded that these factors taken together did justify a three-level departure. *Koon,* 833 F.Supp. at 786.

█ We do not quarrel with the district court's approach. Our circuit has recognized that although "[t]he [federal sentencing] statute speaks in the singular of 'mitigating circumstance,' . . . [t]here is no reason to be so literal minded as to hold that a combination of factors cannot together constitute a mitigating circumstance." *United States v. Cook,* 938 F.2d 149, 153 (9th Cir.1991). We have held that a "unique combination of factors" may constitute a "circumstance" that mitigates. *Id.; see also United States v.*

*Floyd,* 945 F.2d 1096, 1099 (9th Cir.1991), *corrected,* 956 F.2d 203 (9th Cir.1992), *and subsequently superseded,* U.S.S.G. § 5H1.12; *Anders,* 956 F.2d at 911–14.

█ However, although a district court may grant a departure based on a combination of factors that do not individually justify a departure, this policy does not permit the district court to consider in the mix factors that should not be part of the consideration. "[T]he factors that go into [a] complex must be those at least authorized, and certainly not expressly prohibited, by the Sentencing Guidelines." *Anders,* 956 F.2d at 914. For this reason, we first consider individually each of the factors identified by the court to determine if each is an appropriate part of the mix.

As we examine each factor, our purpose is not to determine whether each factor taken alone justifies a departure, but rather whether consideration of the particular factor at all as part of the decision to depart is consistent with the structure and purposes of the Guidelines and the federal sentencing statutes. Were we to determine that these factors constitute permissible grounds for a departure, we would then consider whether, taken in combination, these factors constitute a circumstance that mitigates.[31]

#### a. *Additional Punishment*

In granting the three-level downward departure, the district court relied in part on the fact that appellants would be subject to "additional punishment" that flowed from their convictions in addition to the court-imposed sentence. This "punishment" involved two types: (1) the multiplicity of additional administrative proceedings to which appellants would be subjected, and (2) the

---

**31.** In our previous decisions considering departures based on a combination of factors, the district court has identified a *single* mitigating circumstance which unified these factors and justified a departure. For example, in *Floyd,* we found that a combination of factors—lack of education, imprisonment at age 17, and abandonment by parents—created the single mitigating circumstance of lack of youthful guidance. 945 F.2d at 1099 & n. 2. Similarly, in *United States v. Fairless,* 975 F.2d 664 (9th Cir.1992), we held that a combination of factors created the mitigating circumstance that the defendant's act of

armed robbery was a single act of aberrant behavior. *Id.* at 666–69. In this case, by contrast, the district court did not suggest that the separate factors it identified combined to form a single mitigating circumstance, but instead identified three unrelated factors. Although we question whether the rationale we announced in *Cook* extends to cases in which a downward departure is based on a combination of *unrelated* factors, we need not decide this issue because we conclude that none of the individual factors identified by the district court should have been considered in making the decision to depart.

anticipated abuse in prison because of appellants' particular vulnerability. *Koon*, 833 F.Supp. at 788–89. The district court relied on separate analyses to justify these two types of "additional punishment."

### i. Additional Adversarial Proceedings

The court recognized that, because of their convictions, appellants would be subjected to quasi-judicial administrative proceedings before the LAPD Board of Rights, resulting in appellants' loss of employment and tenure, their prospective disqualification from the field of law enforcement, and the anguish and disgrace of these deprivations. *Koon*, 833 F.Supp. at 789. The only case cited by the district court to support this departure is *United States v. Aguilar*, 994 F.2d 609 (9th Cir.), *op. withdrawn*, 11 F.3d 124 (1993), and *op. replaced on reh'g en banc*, 21 F.3d 1475 (1994), an opinion which has since been withdrawn and is no longer sound precedent.

■ As we have already noted, a district court may depart only "if the circumstance upon which it seeks to base its departure 'is consistent with the sentencing factors prescribed by Congress.'" *United States v. Pacheco–Osuna*, 23 F.3d 269, 271 (9th Cir.1994) (quoting *Lira–Barraza*, 941 F.2d at 746.) Thus,

> [a]lthough § 3553(b) does not define the term "aggravating or mitigating circumstance," the term does suggest that a factor constitutes a permissible basis for departure *only if it speaks to the culpability of the defendant or the severity of the offense, or if it is otherwise related to some other congressionally-authorized legitimate sentencing concern.*

*United States v. Crippen*, 961 F.2d 882, 884 (9th Cir.) (emphasis added), *cert. denied*, —

U.S. ——, 113 S.Ct. 438, 121 L.Ed.2d 358 (1992). "The list of factors relevant to sentencing includes the nature and seriousness of the offense, deterrence of criminal conduct, protection of the public from further crimes by the defendant, correctional treatment of the defendant, the history and characteristics of the defendant, ... the need to avoid unwarranted sentencing disparities," promotion of respect for the law, and the provision of just punishment. *Pacheco–Osuna*, 23 F.3d at 272; *see also Crippen*, 961 F.2d at 884; 18 U.S.C. § 3553(a).

In *United States v. Alvarez–Cardenas*, 902 F.2d 734 (9th Cir.1990), we considered whether the fact that a defendant faced a threat of deportation was an appropriate fact to consider at sentencing. Reasoning that the threat of deportation was not a circumstance that spoke to the offense in question or to the offender's character, we concluded that the threat of deportation was irrelevant for sentencing purposes. *Id.* at 737. We subsequently noted that the threat of deportation did not fall within any of the sentencing factors set forth by Congress in § 3553(a). *Crippen*, 961 F.2d at 885.[32] Since our decision in *Alvarez–Cardenas*, we have refused to permit departures based on factors that do not speak to the offender's character, the nature or seriousness of the offense, or some other legitimate sentencing concern. *See United States v. Ullyses–Salazar*, 28 F.3d 932, 938 (9th Cir.1994) (deterrence of government misconduct that has not persuaded defendant to break the law is not an appropriate ground for a departure); *Pacheco–Osuna*, 23 F.3d at 272 (same); *United States v. Williams*, 978 F.2d 1133, 1136 (9th Cir.1992), *cert. denied*, — U.S. ——, 113 S.Ct. 1606, 123 L.Ed.2d 168 (1993) (same).[33]

---

**32.** We also noted that the Sentencing Guidelines suggest that departures from the sentencing range prescribed by the Guidelines generally reflect the defendant's culpability and the seriousness of the offense. *Compare* U.S.S.G. § 5K2 (listing as grounds for departure factors based on the characteristic of the crime or on characteristics particular to the defendant's culpability or danger to society) *with* U.S.S.G. § 5H1 (factors that speak to the defendant's personal characteristics or to his status are generally not proper grounds for a departure).

**33.** In stating that factors that speak to the nature and seriousness of the crime or to the offender's culpability are relevant to sentencing and to departure, we do not intend to imply that factors that do not speak to these issues are *never* relevant. *See Crippen*, 961 F.2d at 885 ("We do not mean to suggest that only factors which bear upon a defendant's personal history or upon the crime in question may be considered in sentencing. Courts may depart for other aggravating or mitigating circumstances."); U.S.S.G. Ch. 1, Pt. A, § 4(b) (with the exception of certain listed factors "that the court cannot take into account

■ Personal and professional consequences that stem from a criminal conviction are not appropriate grounds for departing, nor are they appropriately considered as part of a larger complex of factors. They are not tied to any penological purpose or legitimate sentencing concern expressed in the federal sentencing statutes.

■ Contrary to the district court's assumptions, sentences imposed under the Guidelines do not impose the only consequence of committing a crime, nor is it intended that they be the only consequence. To the contrary, the societal consequences that flow from a criminal conviction are virtually unlimited. Individuals may lose their jobs or be foreclosed from serving in future professions; their marriages are destroyed; they may be plunged into poverty. Some individuals may be deported, *see United States v. Alvarez–Cardenas*, 902 F.2d 734, 737 (9th Cir.1990), while those who have been convicted of drug or racketeering offenses may lose their homes and their investments to the federal government in forfeiture proceedings. World class figure skaters may lose the right to compete in international competition. Virtually all individuals who are convicted of serious crimes suffer humiliation and shame, and many may be ostracized by their communities.

■ All of these consequences could be considered "additional punishments" that flow from conviction, yet seldom can one conceive of a situation in which these consequences form an appropriate basis for granting a departure. This is so because the criminal justice system cannot and does not attempt to be the sole arbiter of the consequences of criminal acts. To permit the courts to assume such a role would create a system of sentencing that would be boundless in the moral, social, and psychological examinations it required courts to make. *See United States v. Walker*, 27 F.3d 417, 419 (9th Cir.1994) (refusing to hold that post-arrest emotional trauma is a valid ground for

a departure and noting that if it did, every arrestee would request a departure on that basis and that courts would be powerless to separate the valid claims from the invalid). Given the range of possible "additional punishments" that a court might consider when sentencing, the district court's suggested approach can only lead to huge disparities in sentences, thereby conflicting with one of the overriding purposes of the Sentencing Guidelines: the reduction of sentencing disparities between individuals who have committed equivalent crimes. *See* 28 U.S.C. §§ 991(b)(1)(B) & 994(f). A related concern is the ease with which this factor can be used to justify departures that are based, either consciously or unconsciously, on the defendant's socioeconomic status, a factor that is *never* a permissible basis for a departure. *See* U.S.S.G. § 5H1.10.

■ As a final matter, the consequences of conviction identified by the court as a basis for downward departure are troubling because they stem from the fact that appellants, as police officers, held positions of trust and respected status in society and have abused this trust. *See Koon*, 833 F.Supp. at 789 ("[i]n short, because Koon and Powell are police officers, certain unique burdens flow from their convictions."). Rather than reducing a punishment for such individuals, the Guidelines would enhance the punishment, viewing persons who abuse their positions of trust as more culpable than those offenders who do not hold such a position. U.S.S.G. § 3B1.3 comment. (backg'd).

In sum, we conclude that the district court's reliance on the "additional punishment" flowing from appellants' criminal conviction was impermissible.

ii. *Extreme vulnerability to prison abuse*

In addition to relying on the "additional punishment" that flows from criminal conviction, the district court considered as "additional punishment" appellants' potential ex-

as grounds for a departure ... the Commission does not intend to limit the kinds of factors, whether or not mentioned anywhere else in the guidelines, that could constitute grounds for departure in an unusual case."). We note only that "for a factor to be considered, it must be tied to

*some* legitimate penological purpose or legitimate sentencing concern expressed in the Sentencing Reform Act." *Crippen*, 961 F.2d at 885. In most cases, these factors will speak to the nature and seriousness of the defendant's crime or to his culpability.

treme vulnerability to abuse in prison. The court noted that "the widespread publicity and emotional outrage which have surrounded this case from the outset, in addition to the defendants' status as police officers, lead the Court to find that Koon and Powell are particularly likely to be targets of abuse during their incarceration." *Koon*, 833 F.Supp. at 788. In justifying this basis for the departure, the district court relied on two opinions from the Second Circuit which affirmed a downward departure based on the defendant's "extreme vulnerability" to prison abuse. *United States v. Gonzalez*, 945 F.2d 525 (2d Cir.1991); *United States v. Lara*, 905 F.2d 599 (2d Cir.1990).

In *Lara*, the Second Circuit upheld a departure where the defendant had previously been victimized "as a consequence of his diminutive size, immature appearance and bisexual orientation," and the only way to protect him was to place him in solitary confinement. 905 F.2d at 601. The court held that although the Sentencing Commission had considered the vulnerability of offenders to physical attack in prison when it formulated the Guidelines, *see* 28 U.S.C. § 994(g), it did not consider vulnerability to the extent present in the case before it— "where the only means for prison officials to protect [the defendant] was to place him in solitary confinement." *Id.* at 604. The Second Circuit subsequently extended this analysis in *Gonzalez*, where it approved a downward departure for a defendant who was small, feminine-looking, and had the appearance of a fourteen year old, even though there was no history of prior prison abuse and no indication that the defendant would be placed in solitary confinement. 945 F.2d at 526–27.

■ Although our circuit has never upheld a downward departure on the grounds of extreme vulnerability to prison abuse, we have implied that such a departure might be appropriate in certain circumstances. *United States v. Martinez–Guerrero*, 987 F.2d 618, 620 (9th Cir.1993). However, the extension of the Second Circuit's cases to appellants' case is problematic because appellants' vulnerability rests solely on their status as police officers and on the public outrage that their crime engendered. In contrast, in *Martinez–Guerrero*, we understood the Second Circuit's cases to rely primarily upon the defendant's *physical* characteristics, including the individual's age, mental condition, and the existence of physical impairments. *Id.* at 620–21; *see also* U.S.S.G. §§ 5H1.1, 5H1.3, 5H1.4. We agreed that an extraordinary physical impairment might provide a reason for a departure but concluded that legal blindness did not constitute such an impairment. *Id.; see also United States v. Garza–Juarez*, 992 F.2d 896 (9th Cir.1993) (affirming downward departure based in part on serious mental disorder that causes defendant to suffer from panic attacks with agoraphobia), *cert. denied,* —— U.S. ——, 114 S.Ct. 724, 126 L.Ed.2d 688 (1994); *United States v. Long*, 977 F.2d 1264, 1277 (8th Cir.1992) ("an extraordinary physical impairment that results in extreme vulnerability is a legitimate basis for departure").

Thus, although we have recognized the possibility of basing a departure on an extraordinary physical impairment, we have never extended this analysis to include departure based on an individual's occupation or his notoriety. We decline to do so today on the grounds that in this case such a departure would be inconsistent with the structure and policies of the Guidelines.

Although it is true that police officers, as a group, are unpopular with prison inmates and are vulnerable to abuse in prison, the reliance *solely* on hostility toward a group of which the defendant is a member provides an unlimited open-ended rationale for departing. While a departure based on U.S.S.G. § 5H1.4 involves the relatively objective question of whether an extraordinary physical impairment exists, the determination of whether an individual's membership in a group regarded with hostility leaves him vulnerable is both subjective and open-ended. Nothing would prevent this rationale from being applied to numerous groups—such as gang members who may face increased abuse from members of a rival gang, police informants, or child abusers—all of whom face an increased risk of abuse in prison. Because the number of defendants who might qualify for this departure is virtually unlimited, acceptance of this

basis for departure would subvert the Guidelines' goal of reducing unwarranted disparities in sentencing. 18 U.S.C.A. § 3553(a)(6).[34]

Extension of the Second Circuit's cases to appellants' case is troubling for another reason as well. Unlike the physical vulnerability cases in which the departure is grounded on factors over which the defendant has little or no control, in this case the vulnerability to prison abuse arises directly from the public's awareness of appellants' crime. Any public outrage was the direct result of appellants' criminal acts. It is incongruous and inappropriate to reduce appellants' sentences specifically because individuals in society have condemned their acts as criminal and an abuse of the trust that society placed in them. We therefore conclude that a downward departure based on public outrage over the crime that was committed is contrary to the Guidelines' goals of promoting respect for the law and imposing sentences that reflect the seriousness of the crime. *See* 18 U.S.C.A. § 3553(a)(2)(A).[35]

### b. *Absence of a Need to Protect the Public*

The second factor relied on by the district court in granting the three-level downward departure is the absence of any need to protect the public from future misconduct by appellants. *Koon*, 833 F.Supp. at 789–90. The district court reasoned that the federal sentencing statutes require it to consider the need to protect the public from further criminal activity, *see* 18 U.S.C. § 3553(a)(2)(C), and concluded that because neither Koon nor Powell is dangerous or likely to engage in future criminal conduct, the sentence imposed need not reflect the need to protect the public. *Id.* at 790.

In its opinion, the district court recognized that the Guidelines consider the need for public protection by factoring a defendant's criminal history into the calculation of the sentence. *See* U.S.S.G. Ch. 4, Pt. A, intro. comment. Thus, the Guidelines specifically provide that first-time offenders like Koon and Powell should be classified in Criminal History Category I. U.S.S.G. §§ 4A1.1, 4A1.3, Ch. 5, Pt. A. However, the court reasoned that

> Koon and Powell fall into the lowest criminal history category, along with first-time offenders who may manifest a violent nature or a potential for recidivism. Within Criminal History Category I, the Guidelines do not adequately distinguish defendants who, for a variety of reasons, are particularly likely to commit crimes in the future. Here, the need to protect the public from the defendants' future criminal conduct is absent "to a degree" not contemplated by the Guidelines.

*Koon*, 833 F.Supp. at 790 n. 20.

■ We are sympathetic to the district court's belief that appellants' low likelihood of recidivism should be relevant in fashioning a sentence. However, the fact that appellants are neither dangerous nor likely to commit crimes in the future is not an appropriate basis for a departure in this case. Although it is true that some offenders who are classified in Criminal History Category I have a greater likelihood of recidivism than appellants, the Commission already took this factor into account when it drafted the Guidelines, which provide:

> The lower limit of the range for a Category I criminal history is set for a first time offender with the lowest risk of recidivism. Therefore, a departure below the lower limit of the guideline range for Criminal History Category I on the basis of the

---

34. Contrary to the situation in *Lara*, nothing in the record suggests that appellants must be placed in continuous solitary confinement in order to protect them from abuse in prison. We are not faced with a situation in which the punishment imposed by the criminal justice system is far harsher than ordinary, and thus we do not decide whether a downward departure in such a situation is permissible.

35. We recognize that this case received exceptional media coverage and that the Holliday videotape was viewed worldwide. Thus, contrary to most cases in which a police officer stands accused of unlawfully depriving a citizen of her civil rights, the entire world was·aware of the arrest of Rodney King. The district court was therefore correct that the publicity and emotional outrage that have surrounded this case are exceptional. However, such a fortuity is an insufficient basis for granting a downward departure.

adequacy of criminal history cannot be appropriate.

U.S.S.G. § 4A1.3, p.s.

■ Thus, the Commission has expressly disapproved of sentencing courts' departing below the range for the category that already reflects the lowest risk. This is so even for defendants who may be unusually unlikely to commit crimes in the future. For this reason, a downward departure based on these grounds is inconsistent with the Sentencing Guidelines. *See United States v. Farah*, 991 F.2d 1065, 1070 (2d Cir.1993); *United States v. Mogel*, 956 F.2d 1555, 1563 (11th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 167, 121 L.Ed.2d 115 (1992).[36]

### c. *Successive State and Federal Prosecutions*

The third and final factor cited by the district court in granting a three level departure is the "spectre of unfairness" and the burden on the defendants created by successive state and federal prosecutions. *Koon*, 833 F.Supp. at 790. As the district court properly recognized, the federal prosecution of Koon and Powell did not violate the Fifth Amendment's prohibition against double jeopardy: under the doctrine of "dual sovereignty," the state and federal governments may each prosecute an individual for the same act when that act violates each sovereign's respective laws. *Heath v. Alabama*, 474 U.S. 82, 89, 106 S.Ct. 433, 437, 88 L.Ed.2d 387 (1985). However, the court concluded that the federal conviction following a state acquittal raises a "spectre of unfairness" that imposes unique burdens on appellants and supports a downward departure. *Koon*, 833 F.Supp. at 790.

■ Reliance on the "spectre of unfairness" of dual prosecutions to support a departure is improper because it speaks neither to the culpability of the defendant, the severity of the offense, nor to some other legitimate sentencing concern. *See Crippen*, 961 F.2d at 884. To the contrary, application of this factor directly conflicts with the court's mandate to impose a sentence that "reflect[s] the seriousness of the offense." 18 U.S.C. § 3553(a)(2)(A). Once the state has prosecuted an individual for a criminal act, the federal government will undertake a successive prosecution only when the Attorney General decides that the earlier state prosecution did not vindicate "compelling [f]ederal interests." *United States v. Snell*, 592 F.2d 1083, 1087–88 (9th Cir.), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979). In this case, the Attorney General's authorization of a federal prosecution necessarily reflected the conclusion that the distinct federal interests in protecting the constitutional rights of citizens to be free from unreasonable force at the hands of government had not been adequately vindicated in the state court proceeding. To *reduce* a sentence in these circumstances is in direct conflict with the Guidelines. We find nothing in the structure or policies of the Guidelines to support a departure on the grounds that successive prosecutions are burdensome. *See United States v. Woodard*, 927 F.2d 433, 435 (8th Cir.) (rejecting argument that prior state prosecution for same conduct should lead to a more lenient sentence), *cert. denied*, — U.S. —, 112 S.Ct. 246, 116 L.Ed.2d 201 (1991).

In sum, we conclude that consideration of any of the factors identified by the district court to support the three-level departure, separately or collectively, is, under the facts of this case, inconsistent with the structure and policies of the Guidelines. These factors are improper grounds on which to rest a departure.

### 2. *Five–Level Downward Departure*

In support of the five-level departure, the district court cited U.S.S.G. § 5K2.10, p.s., which states that a court may sentence below the Guidelines range "[i]f the victim's wrongful conduct contributed significantly to provoking the offense behavior." The government contends that departing on this basis was erroneous because, generally speaking, victim misconduct does not remove a criminal

---

**36.** In a similar context, we have relied on these policy statements in the Guidelines to hold that a downward departure from Criminal History Category I cannot be based on the defendant's "absolutely clean prior record." *United States v. Berlier*, 948 F.2d 1093, 1095 (9th Cir.1991).

prosecution against a police officer from the heartland of cases to which 18 U.S.C. § 242 and U.S.S.G. § 2H1.4 apply. The government observes that police officers as part of their job must interact on a regular basis with persons who break the law; victim misconduct is the norm, not the exception. The government also points out that police officers, unlike civilians, are carefully trained on how to respond appropriately to misconduct, and how to avoid becoming provoked and overreacting; hence, the government argues, provocation is less exculpatory in a police misconduct case.

A close examination of the district court's sentencing memorandum reveals that the court ultimately did not conclude that appellants were provoked in precisely the manner contemplated by § 5K2.10. The guideline requires that the victim's wrongful conduct "contributed significantly to provoking the offense behavior." After summarizing King's misconduct—speeding, driving while intoxicated, fleeing in his car from pursuing officers, refusing to obey the officers' commands to get on the ground and remain prone, attempting to escape from police custody, charging Powell—the court acknowledged that

> Mr. King's provocative behavior eventually subsided. The Court recognizes that by the time the defendants' conduct crossed the line to unlawfulness, Mr. King was no longer resisting arrest. He posed no objective threat, and the defendants had no reasonable perception of danger.

*Koon,* 833 F.Supp. at 787. The court concluded that King's wrongful conduct was "[t]he *initial* provocation for the subsequent course of events," that "the defendants' *early* perception of Mr. King as dangerous was reasonable," and that Koon and Powell "at least *initially*[ ] were invited to use force." *Id.* at 786–87 (emphasis added). The court found that many of the factors which are relevant in determining the extent of departure under § 5K2.10—features which the district court also viewed as relevant in deciding whether to depart at all, *id.* at 787 & n. 13—weighed in favor of appellants with respect to appellants' *initial, lawful conduct.* But the court found that these factors were no longer

present when appellants' conduct became criminal. The court recognized that by the time Powell struck, and Koon permitted to be struck, those blows for which appellants were criminally liable, King no longer presented a danger, no longer reasonably appeared to present a danger, and was no longer persisting in misconduct. *Id.* at 787; *see* U.S.S.G. § 5K2.10(b)–(d).

The district court thus determined not that King's misconduct "provoked" the offense conduct—the "provocative" behavior had "subsided" before appellants committed their criminal acts—but rather that "the incident would not have escalated to this point, indeed it would not have occurred at all, but for Mr. King's initial misconduct." *Koon,* 833 F.Supp. at 787. "But-for" causation, however, is not the proper analysis under § 5K2.10. But-for causation is a much less demanding standard than provocation; indeed, such a standard does not require victim misconduct at all. By relying on the concept of but-for causation, the district court implicitly recognized that § 5K2.10 does not apply, at least not in the usual sense.

After concluding that King's provocative behavior had subsided before appellants committed the offense conduct, the district court provided the following justification for the departure:

> Because the defendants were convicted of violation of 18 U.S.C. § 242, Guideline Section 2H4.1 for interference with civil rights under color of law, and Guideline Section 2A2.2, for aggravated assault linguistically apply. However, Mr. King's wrongdoing and the substantial role it played in bringing about the defendants' unlawful conduct remove this case from the "heartland" of offenses contemplated by the aggravated assault Guideline. *See* Guidelines, Ch. 1, Pt. A., § 4(b).

Messrs. Koon and Powell were convicted of conduct which began as a legal use of force against a resistant suspect and subsequently crossed the line to unlawfulness, all in a matter of seconds, during the course of a dynamic arrest situation. However, the convicted offenses fall under the same Guideline Sections that would apply to a jailor, correctional officer, police

officer or other state agent who intentionally used a dangerous weapon to assault an inmate, without legitimate cause to initiate a use of force.

The two situations are clearly different. Police officers are always armed with "dangerous weapons" and may legitimately employ those weapons to administer reasonable force. Where an officer's initial use of force is provoked and lawful, the line between a legal arrest and an unlawful deprivation of civil rights within the aggravated assault Guideline is relatively thin. The stringent aggravated assault Guideline, along with its upward adjustments for use of a deadly weapon and bodily injury, contemplates a range of offenses involving deliberate and unprovoked assaultive conduct. The Guidelines do not adequately account for differences between such "heartland" offenses and the case at hand.

The criminal conduct of a state officer who launches an unprovoked assault on an individual in custody is dissimilar to the conduct of defendants Koon and Powell who, at least initially, were incited to use force. Consistent with the policy of the Guidelines, the sentence imposed must reflect this disparity.

*Koon,* 833 F.Supp. at 787.

The district court ultimately focused not on provocation itself but rather on the volatility of the incident, and the close proximity between, on the one hand, the victim's misconduct and the officers' concomitant lawful use of force, and, on the other hand, the appellants' unlawful use or authorization of the use of force. We must determine whether this basis for departure—as opposed to a more straightforward application of § 5K2.10—is legally permissible.

We begin by noting that in *Graham v. Connor,* the Supreme Court, in formulating the test for the evaluation of excessive force claims under the Fourth Amendment, recognized that

[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolv-

ing—about the amount of force that is necessary in a particular situation.

490 U.S. at 396–97, 109 S.Ct. at 1872. Thus *before* a use of force can be found excessive, the *Graham* "calculus," embracing the very factor which the district court found to be unusual in this case—the "dynamic arrest situation"—has been taken into consideration. The quoted language from *Graham* was included in the jury instructions in this case, and was reiterated by the government in closing. The incorporation of this consideration into the basic fabric of the law in this area strongly suggests that provocation by the victim in a situation where an officer must act instantly is typical—not unusual.

This case differs in one respect from many of the cases in which the *Graham* standard has been applied. The bulk of those cases are civil. In this criminal prosecution, in addition to proving that Powell used and Koon permitted officers under his command to use excessive force, the government was required to prove beyond a reasonable doubt that appellants intended to subject King to a deprivation of his civil rights. This required the jury once again to take the *Graham* factors into account, and required the government to make the difficult showing that appellants *willfully* came down on the wrong side of the *Graham* standard. Thus the feature which the district court found unusual, and exculpatory, is built into the most fundamental structure of excessive force jurisprudence, and in criminal cases is built in twice.

The district court was troubled by the fact that U.S.S.G. § 2H1.4 applies both to excessive force cases of the *Graham* variety and to cases in which a law enforcement or corrections officer applies force which is unlawful from the beginning. The district court saw the appellants' lawful authority to use or allow the use of *some* force, and what it perceived as the slenderness of the line between legitimate and illegitimate force, as factors partially exculpating appellants. Section 2H1.4, however, adopts exactly the opposite approach. The guideline punishes those vested with governmental authority *more* severely than private actors who are guilty of comparable conduct: this is the reason the

guideline starts with the "underlying" offense and then increases the offense level by 6. *See* U.S.S.G. § 2H1.4, comment. (backg'd); *see also* U.S.S.G. § 3B1.3, comment. (backg'd). The fact that appellants were authorized to use *some* force in this case does not mitigate the fact that they used too much. Under the structure and policies of the Guidelines, it makes it worse.

 In a great many § 242 cases, the defendant has authority to use appropriate force. The district court's rationale for departure in this case was that here, due to the victim's misconduct, the officers were legitimately called upon to use force *in this particular incident,* and that the incident itself was so volatile that legal force quickly became illegal. But the policy behind the punitive structure of § 2H1.4 does not apply any less to an officer who crosses the line into illegality *after* he begins to apply force to a victim than it does to the officer who crosses that line *as soon as* he begins to hurt the victim. The policy behind the guideline applies with equal or greater force in the former case: the victim who is a wrongdoer is especially vulnerable to abuses by officials, because the legitimate sway of authority over him is greater to begin with. The structure of § 2H1.4 suggests that the slenderness of the line separating legal from illegal uses of state power is a reason for victims, and for society, to be especially concerned. It cannot at the same time be a reason to partially excuse those who transgress.[37]

As justification for the five-level departure, the district court relied not only on the conclusion that appellants' offense conduct fell outside the heartland of § 2H1.4 cases, but also on the conclusion that it fell outside the heartland of *aggravated assault* cases (i.e., § 2A2.2). "The stringent aggravated assault Guideline ... contemplates a range of offenses involving deliberate and unprovoked assaultive conduct. The Guidelines do not adequately account for differences between such 'heartland' offenses and the case at hand." *Koon,* 833 F.Supp. at 787. The district court thus drew an implicit contrast between appellants and *civilian* offenders, noting that "Koon and Powell did not seek out a victim; rather, their very presence at the scene was a consequence of Mr. King's wrongful conduct." *Id.* Similarly, the court noted that "[p]olice officers are always armed with 'dangerous weapons' "—thereby suggesting that application of the weapons enhancement may be unfair in a case where the defendant is a police officer rather than a civilian. *Id.*

But to depart because of a perception that this case falls outside the heartland of aggravated assault cases again subverts the structure of § 2H1.4. That guideline explicitly enhances sentences for official misconduct *beyond* those for civilian misconduct. The Sentencing Commission cannot have been blind to the fact that the circumstances out of which official misconduct arises are different from the circumstances which give rise to civilian misconduct. The Commission, in fact, recognized those differences and used them as the basis for harsher rather than more lenient punishment.

We conclude that the district court's rationale for departing downward is flawed. The court isolated as unusual a factor which is at the very heart of excessive force jurispru-

---

37. The fact that § 2H1.4, like § 242, encompasses different kinds and degrees of misconduct is in itself insufficient to justify a downward departure. *See United States v. LeBlanc,* 24 F.3d 340, 347 (1st Cir.1994) (although money laundering offenses which stem from prior unlawful activity of running an illegal gambling business differ from the "classic" offense of laundering drug money, downward departure is impermissible because the offense at issue falls within the plain language of the statute and clearly was intended to be reached by Congress). Appellants' conduct fell squarely within § 242: the statute criminalizes the deprivation of *all* Constitutional rights. *United States v. Price,* 383 U.S. 787, 803, 86 S.Ct. 1152, 1161, 16 L.Ed.2d 267 (1966) (discussing legislative history). Hence "once a due process right has been made specific by court decisions, that right is encompassed by § 242." *United States v. Langer,* 958 F.2d 522, 524 (2d Cir.1992) (internal quotation marks and citations omitted). The rights King was deprived of have been clearly established for decades, and willful conduct which deprived him of those rights falls within the heartland of both the statute and the Guidelines. The fact that willful violators of the rights at issue in this case may not be prosecuted as often as other violators of § 242 does not alter the analysis. In itself it says nothing about individual culpability, although it may say something about evidentiary difficulties and about the litigation strategies of the federal government.

dence. The court also adopted an approach toward official misconduct which is antithetical to the approach embodied in the applicable guideline. The five-level downward departure was not justified.[38]

### 3. *Failure to Adjust Upward Four Points for Serious Bodily Injury*

■ The district court imposed a two-level upward adjustment for bodily injury under U.S.S.G. § 2A2.2(b)(3)(A), rather than a four-level adjustment for serious bodily injury under U.S.S.G. § 2A2.2(b)(3)(B). The government argues that the latter adjustment is warranted by the blow, administered by Powell 43 seconds into the videotape, which fractured King's leg. The district court acknowledged that this blow caused serious bodily injury, but found that Powell was not acting criminally when he delivered it.

As the government points out, the district court left it unclear whether or not the blow in question constituted excessive force: the court found that the blow "may have been tortious," 833 F.Supp. at 778, but concluded that Powell was not *criminally* liable for the blow, because the court was unable to find that he had intended at that time to use excessive force.[39] *Id.* It is the latter conclusion which the government attacks on appeal.

The district court supported its findings with the following observations: (1) blows to the leg joints are within LAPD policy, if necessary to avert a threat; (2) preceding the blow, the situation had evolved rapidly, and (3) King had tried to rise; (4) even as Powell delivered blows around the time of second 43, King continued to move, and to resist attempts to place him into the felony-prone position. *Id.*

The government contends that these reasons cannot be sustained, and musters countervailing evidence of its own: (1) there is a presumption that people who use unreasonable force know that it is unreasonable; (2) both Koon and Powell showed an awareness of wrongdoing after the event (by lying and by bragging); (3) Koon and Powell had been taught not to use a baton on a suspect, unless the suspect is combative or aggressive; and (4) there is no reason to distinguish the leg-breaking blow from the later blows which the court found *were* criminal.

None of these arguments establishes that the district court committed clear error.

First, the district court was not bound to embrace the presumption which the government contends should apply. The court's specific findings of fact override general presumptions.

Second, the fact that Koon and Powell may have been conscious of guilt does not show *when* their criminal wrongdoing occurred. Their lies and boasts may have been directed to the later conduct which the district court found was criminal, and not to the earlier conduct. The later blows caused only soft tissue bruising.

Even if Powell's most damaging blow was not authorized by LAPD policy, this does not mean that Powell necessarily intended to use unreasonable force. Police department policy permitted blows to forestall aggressive or combative behavior, and the district court found that King was continuing to move at the time. While such movement may not in fact have been aggressive, it may have appeared so. Powell's reaction could reason-

---

**38.** We do not conclude that a departure for victim misconduct would *never* be permissible in a police case. Such a departure might be appropriate, where, for example, the victim kills or wounds an officer's partner in his presence. In such a case, victim misconduct plays a role similar to that played by provocation in the more usual crimes of passion: the defendant is to a certain extent excused because he was seized by passion, and acted in the heat of the moment. This appears to have been the rationale in those cases where departures under § 5K2.10 were affirmed. *See United States v. Tsosie,* 14 F.3d 1438 (10th Cir.1994); *United States v. Yellow*

*Earrings,* 891 F.2d 650 (8th Cir.1989) (assaults triggered by sexual jealousy or humiliation). This is distinguishable from the district court's rationale, which relies on the vicissitudes of police work, and the difficulty in drawing the line between proper and improper uses of force.

**39.** The district court made the same finding with respect to Koon's criminal liability for the leg injury, and for the same reasons. *Koon,* 833 F.Supp. at 779–80. In the remainder of this discussion, references to Powell's liability refer to Koon's as well.

ably be found to be an error of judgment rather than an intentional use of excessive force.

Finally, the district court provided a reason to distinguish between the officers' intent at the time of the leg-breaking blow and their intent during the 19 seconds of the videotape in which the court concluded that criminal activity occurred. Those latter 19 seconds were preceded by a period in which King lay on his stomach, and posed no threat. *Koon,* 833 F.Supp. at 777. The court found no comparable period of compliance preceding the leg-breaking blow.

The government quarrels with the evidentiary basis for this latter finding, and contends that both the Holliday videotape and the testimony of government witnesses establish that King ceased to pose a threat, at the very latest, 30 seconds into the tape. But the defense witnesses testified that King continued to pose a threat at that time. The district court concluded that the videotape was "sometimes an ambiguous record of the crucial events," *id.* at 776, and the conflicting testimony at trial bore this out. Although we may not agree, the district court resolved those ambiguities in favor of the defense. Its resolution was not inconsistent with the verdicts, and the government has not established clear error.

## CONCLUSION

We affirm appellants' convictions. After a careful review of the record and the relevant authorities, we are convinced that the district judge correctly resolved each of the legal issues raised by appellants as to the guilt phase of the proceedings. He conducted the trial with impeccable fairness and careful and thoughtful attention to its every aspect. We appreciate the magnitude of the task, given the unusual number and complexity of the issues involved, and the difficult circumstances caused by the extraordinary publicity surrounding every phase of the proceedings. However, we are also convinced that the sentences imposed by the district court are inconsistent with the structure and policies of the Sentencing Guidelines and the federal sentencing statutes, and we therefore vacate

the sentences and remand for resentencing consistent with this opinion.

**AFFIRMED IN PART; VACATED IN PART AND REMANDED FOR RESENTENCING.**